**BRIGGS v. HOFFERBERT.**

Civ. No. 4189.

United States District Court
D. Maryland.

Aug. 5, 1949.

V. Stephen Lassotovitch, of Baltimore, Md., and H. Kennedy McCook, of Washington, D. C., for plaintiff.

Norman P. Ramsey, Asst. U. S. Atty., Baltimore, Md., and Homer R. Miller, Sp. Asst. to Atty. Gen., for defendant.

COLEMAN, Chief Judge.

This is a suit for the refund of Federal income taxes.

The plaintiff, in due course, filed his tax returns for the years 1943, 1944 and 1945 and paid the taxes called for by these returns. Subsequently, however, the plaintiff believed that he had erroneously failed to take into account, in making these returns and payments, the fact that in each of these three years certain rather large sums that he had received were not, as he had reported on his returns, ordinary income taxable pursuant to Section 22(a) of the Internal Revenue Code, 26 U.S.C.A. § 22(a), but proceeds from the sale of patents and therefore taxable at capital gain rates pursuant to the provisions of Section 117 of the Internal Revenue Code, 26 U.S.C.A. § 117. Accordingly, he filed claims for refunds, but these claims were all rejected by the Commissioner of Internal Revenue, and the plaintiff now sues to recover the amount of the alleged over payment for each of the three years, which aggregate $39,155.66.

The pertinent provisions of Section 117 of the Internal Revenue Code, 26 U.S.C. A. § 117, are as follows:

"Capital gains and losses

"(a) Definitions. As used in this chapter—

"(1) Capital assets. The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(*l*) * * * ;

"(2) Short-term capital gain. The term 'short-term capital gain' means gain from the sale or exchange of a capital asset held for not more than 6 months, if and to the extent such gain is taken into account in computing net income;

\* \* \* \* \* \*

"(4) Long-term capital gain. The term 'long-term capital gain' means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing net income;

\* \* \* \* \* \*

"(b) Percentage taken into account. In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net capital gain, net capital loss, and net income:

"100 per centum if the capital asset has been held for not more than 6 months;

"50 per centum if the capital asset has been held for more than 6 months. \* \* \*."

It will be seen from the above-quoted statutory provisions that the plaintiff taxpayer in order to have the benefit of them, must prove three things: (1) that the money he received from the patents here involved represents proceeds from their sale or exchange; (2) that these patents must have been held by him for more than six months prior to their sale or exchange, and (3) that he did not hold them "primarily for sale to customers in the ordinary course of his trade or business."

On behalf of the Collector it is contended that the plaintiff taxpayer has failed in his proof on the first and third points, if not on the second. As to the first point, it is contended that the taxpayer received the funds in question as compensation for personal services, and not as the result of sale or exchange of patent rights because, it is alleged, he had previously disposed of them. As to the third point, it is contended that the taxpayer was an inventor by trade, and that even assuming the patents in question were owned by him, he, nevertheless, held them "primarily for sale to customers in his trade or business."

From the following facts material to the issues here involved and which we find to be established by the weight of the credible testimony, we believe that the plaintiff has established his right to have the funds in question treated as capital gains and therefore subject to the provisions of Section 117 of the Internal Revenue Code above quoted.

In March, 1933, the plaintiff organized the Briggs Clarifier Company, a corporation, for the manufacture and sale of a patented oil filter. By letter agreement with this corporation he received 75% of its capital stock and $1,500.00 in exchange for the sale of this filter patent and a covenant on his part to turn over to the corporation any improvement inventions upon the patent he had sold, which he might thereafter conceive.

Between March, 1933, and November, 1940, the plaintiff conceived a number of inventions in the field of oil filtration. One invention was an improvement upon the invention sold to the Briggs Company in March, 1933, and this was accordingly assigned to the company. Of the remaining inventions in the same field some were assigned to the company and five were not assigned prior to November 1, 1940.

As of November 1, 1940, the five inventions owned by the plaintiff consisted of (1) a new process for manufacturing Fullers earth refills by the use of iron oxide; (2) a new type of filter known as "breath-

er tube filter"; (3) a new type of refill made of cellulose; (4) a new method of waterproofing paper; and (5) a new type of refill using ribbed cellulose. The first four inventions were conceived and reduced to practice in 1939 and were used by the Briggs Company for the first time in the early part of 1940. The fifth invention was conceived and reduced to practice in June of 1940. Letters patents issued on all of the inventions, excepting the third one referred to, which was abandoned. Inventions 1, 4 and 5 were in use by the corporation during the years 1943, 1944 and 1945.

While the stock of the Briggs Company which the plaintiff originally acquired constituted at that time a substantial interest, it became less than 2½% of the company's total capital stock, and as such was found not sufficient to encourage further discovery and development by the plaintiff in the field of oil filtration. Therefore, the company desired to employ the plaintiff for a definite time at a fixed compensation and, independently of this employment, to compensate him for any of his future inventions in the field of oil filtration which the company might see fit to accept and exploit. Accordingly, by agreement dated November 1, 1940, the plaintiff exclusively licensed the Briggs Company to make, use and sell all of his inventions in the field of oil filtration, in exchange for its covenant to pay royalties on all refills sold by the company during the use of any invention conceived by plaintiff which had not been used by the company prior to January 1, 1940. By separate provisions of the same agreement the plaintiff was employed as an engineer for a period of five years at a stipulated weekly salary. November 30, 1945, the Briggs Clarifier Company assigned all its rights under this contract, with the plaintiff's consent, to the Briggs Filtration Company and on December 1, 1945, the contract of November 1, 1940, was amended, whereby the plaintiff's compensation was materially increased and the term of the contract extended.

The Briggs Company carried the cost of the patent acquired in 1933 on its books as an asset; all other patent costs were treated annually as an expense in the year incurred. In the years 1943, 1944 and 1945 no withholding tax was ever deducted from the royalties paid the plaintiff.

From the foregoing facts, it is clear that the royalties paid to the plaintiff during the years 1943, 1944 and 1945 which amounted to $50,469.15, $34,216.57, and $25,316.49, respectively, (1) represented the proceeds from the sale of inventions held by him for more than six months; (2) did not constitute compensation for services rendered his employer, the Briggs Company, and (3) these inventions were not held by the plaintiff "primarily for sale to customers in the ordinary course of his trade or business."

The main argument of the Government is that by the first contract, made in March, 1933, the plaintiff for 375 shares of capital stock of the Briggs Company, disposed not merely of the single patent therein referred to and any improvements thereon, but also of all future rights in inventions or patents in the same field, and that, therefore, as the Government claims, there were no patent rights or inventions remaining the property of the plaintiff which he could dispose of under the later contract of 1940.

The parts of the 1933 contract on which the Government bases the above argument are as follows:

"The undersigned offers, in exchange for 375 shares of the capital stock of your company and the cash sum of Fifteen Hundred Dollars ($1500.00), to turn over and assign to your company the following property, namely:

"(a) All of my right, title and interest in and to letters patent numbered 1,860,229 issued to me under date of May 24, 1932.

"(b) All of my right, title and interest in and to any existing or future improvements in or to said device or any other devices which I may develop for the same or similar purposes as covered by said patent referred to, and any patents now or hereafter issued thereon in connection therewith in the United States or foreign countries."

The parts of the 1940 agreement upon which the Government relies are the following:

"B—4. That the Engineer [the present plaintiff] hereby grants to the company the sole and exclusive license to use, manufacture, sell and deal in all such inventions, designs, improvements and discoveries conceived or which may be conceived by him, as apply or relate to the field of oil filtration, which said inventions, designs, improvements and discoveries shall be hereinafter referred to as 'Class A Inventions.' This covenant is in confirmation of a similar covenant made by the Engineer to the Company in March of 1933 at the time of an issue of stock to him and, as such, is accepted as binding on him without regard to the duration of his employment, but nevertheless conditioned on the continued existence of the Company as a solvent enterprise.

"C—4. In the event of the acceptance by use or otherwise by the Company of any discovery falling within 'Class A Inventions,' which was not used by the Company prior to January 1, 1940, the Company shall pay to the Engineer, his heirs, executors and assigns, during the period of the use of said discovery in the manufacture of its products or any of them, a royalty as follows:

"a. On all refills sold by the Company at a list price of $3.80 or less, the Engineer shall receive 1% of the sale price realized by the Company with respect thereto.

"b. On all refills sold by the Company at a list price of $3.81 or more, the Engineer shall receive 4% of the sale price realized by the Company with respect thereto.

"It is agreed, however, that said royalty shall be in full payment for the use by the Company of any one or more discoveries falling within Class A inventions."

The 1940 contract closes with a statement that "This contract shall supersede and nullify all previously existing agreements between the parties hereto." But we do not understand that either side now contends that this is to be interpreted as rendering void the 1933 agreement in view of the express "confirmation" of that agreement in paragraph B—4 of the 1940 agreement, as above quoted. We believe this confirmation clause gives much force to the plaintiff's position because it does not say that the *same* covenant is confirmed, but merely a *similar* covenant, that is to say, that this later contract was merely recognizing the transfer that had, by the 1933 agreement, taken place from the plaintiff to the Briggs Company, of one particular patent and improvements thereon, but not of any other inventions or patents of the plaintiff not used by the Company prior to January 1st, 1940; otherwise, there would have been no necessity for paragraph B—4 of the 1940 contract, as it is drawn. While admittedly, the two contracts, when read together, are not free from ambiguity, the last of the numerous "whereas" clauses in the 1940 agreement, reading as follows, further supports plaintiff's position: "Whereas the Engineer [the plaintiff] has expressed his willingness to bind himself for a definite period of employment *and to grant the Company patent rights not heretofore granted to it at all* upon the terms and conditions herein contained." (Emphasis supplied.)

Counsel for neither side has been able to refer the Court to any decision, nor has the Court found any, except decisions by the Tax Court, which are at all closely analogous on their facts, to the present case. But, in any event, every case must be decided upon its own particular facts, and we cannot refrain from stating that the Government's rather lengthy brief, padded with discussion of a good many decisions that clearly are not in point, has tended to confuse rather than to clarify the precise issue before us, both factually and with respect to the law.

The fact that the plaintiff did not make, with respect to the taxes he paid for the years 1941 and 1942, claims for refund as he has done for the three succeeding years, does not, we think, justify any presumption adverse to the plaintiff, especially in view of the state of the law, past and present, as disclosed by published decisions.

The decision in Blum v. Commissioner, 11 T.C. 101, upon which counsel for the

Collector strongly rely, is not, we think, really similar on the facts, to the present case. There, the taxpayer was an engineer employed at a monthly salary, plus commissions based on net sales, to conduct experiments and to work on inventions for his company. The agreement provided that all patents covering articles worked upon by him would be assigned to the company. The Tax Court held that since the taxpayer worked in the company's plant with the assistance of the company's employees and perfected the ideas embodied in his inventions during the continuance of his employment and was therefore under a legal duty to assign the patents, they thereby became the exclusive property of the company by virtue of the employment contract and could not properly be said to have vested in the company pursuant to a sale. Hence the commissions were reportable as ordinary income, and there was no sale or exchange of capital assets within the meaning of the statute.

It will thus be seen that in the Blum case, there was no formal agreement such as that in the present case, for the transfer of the inventions. This is a most material difference. There, the patents in question *always belonged* to the employer as an incident of the employment. Here, they were *never* the property of the employer except by virtue of the formal agreement which transferred them. Note the following language in the Tax Court's opinion, 11 T.C. 101, at page 108:

"The evidence establishes that the employment agreement was entire, not divisible, and combined the features of general employment and employment for solving a particular problem. Cf. United States v. Dubilier Condenser Corporation, 289 U.S. 178 [53 S.Ct. 554, 77 L.Ed. 1114, 85 A.L.R. 1488]. That the term 'invention' was not employed is of no significance.

"In Standard Parts Co. v. Peck, 264 U.S. 52 [44 S.Ct. 239, 68 L.Ed. 560, 32 A.L.R. 1033], the employee agreed to 'devote his time to the development of a process and machinery for the production of the front spring now used on the product of the Ford Motor Company,' and the resulting device was there held to be the property of the employer.

"In the instant case, one of the terms of employment was that petitioner was to devote his attention to the adaptation of the chain saw which the company hoped to manufacture and sell. Petitioner's employment, to the extent that it related to a chain saw, was as much a contract of specific employment to make an invention as was the agreement in the case of Standard Parts Co. v. Peck, supra. Cf. Magnetic Mfg. Co. v. Dings Magnetic Separator Co., [7 Cir.], 16 F.2d 739; certiorari denied, 274 U.S. 740 [47 S.Ct. 586, 71 L.Ed. 1320]; Goodyear Tire & Rubber Co. v. Miller, [9 Cir.], 22 F.2d 353."

While the cases which counsel for plaintiff contend support his position, such as Curtin v. Commissioner, 12 T.C. ——, Kelly v. Commissioner, 12 T.C. ——, and Hessert v. Commissioner, 12 T.C. ——, are based upon facts considerably different from those before us, we nevertheless agree that they have sufficient analogy to lend weight to plaintiff's position which, for the reasons we have herein stated, we believe is correct.

Thus, we conclude that the agreement of November 1, 1940, between the plaintiff and the Briggs Company constituted a sale of capital assets held by plaintiff for more than six months, and that the proceeds derived therefrom in the years 1943, 1944 and 1945, were capital gains and taxable as such, within the meaning of paragraphs (a) (1), (a) (4) and (b) of Section 117 of the Internal Revenue Code. Therefore, plaintiff is entitled to judgment for refund of the amounts claimed for the three years, 1943, 1944 and 1945, in the aggregate amount of $39,155.66, with the allowable statutory interest.