David STERN, III, and Louise Beggs Stern, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 6252.

United States District Court
E. D. Louisiana,
New Orleans Division.

Aug. 11, 1958.

848

Deutsch, Kerrigan & Stiles, Eberhard P. Deutsch, Rene H. Rimel, Jr., H. Paul Simon, New Orleans, La., for plaintiffs.

Charles K. Rice, Asst. Atty. Gen., James P. Garland, Lyle M. Turner, Robert Livingston, Attys., Dept. of Justice, Washington, D. C., M. Hepburn Many, U. S. Atty., Norman W. Prendergast, Asst. U. S. Atty., New Orleans, La., for defendant.

J. SKELLY WRIGHT, District Judge.

This case concerns "Francis," the talking mule. Francis is a product of World War II. It was created by a lonely second lieutenant in the Pacific theater of operations who sometimes wondered whether there was anything in the Army lower than a second lieutenant. Francis convinced him there was. Now, seven motion pictures later, that second lieutenant, the taxpayer here, is claiming that the income from "Francis" is entitled to capital gains treatment under the Internal Revenue laws.

In 1933, after attending Harvard University, David Stern, III, was employed as a dramatic critic for the *Philadelphia Record*, a newspaper owned by his father. Beginning four months later, he became successively comptroller of the *Record*, classified advertising salesman, assistant classified manager, classified manager, promotion manager, and general manager. During the time that Stern was learning the business, he continued to serve the *Record* as part-time dramatic critic. In 1938 he became publisher of the *Courier-Post* newspapers in Camden, New Jersey. Throughout the prewar years, when Stern was a newspaper business executive, his hobby was writing. He wrote some stories and articles in his spare time, but he was unable to sell any of them.

In the spring of 1943, Stern enlisted as a private in the United States Army. He was later commissioned as a second lieutenant, and subsequently became co-officer in charge of the Central Pacific Edition of *Stars and Stripes*. While in the Pacific, Stern wrote some imaginary dialogue between a second lieutenant and an old Army mule, some of which he sold to *Esquire* for approximately $200. He also wrote several short stories while in the Army which he sold to magazines for $50 to $250.

After his release from the Army in 1946, Stern returned to Camden as publisher of the *Courier-Post* newspapers. In 1947 Stern's connection with the *Courier-Post* newspapers was terminated. He immediately entered negotiations to purchase a newspaper. While so doing and at the suggestion of a book publisher, he rewrote in book form all of the episodes about the talking mule, Francis. During this period he also wrote a sequel to "Francis," called "Francis Goes to Washington." It, too, was published by Farrar-Strauss, publisher of "Francis." In July 1949 Stern completed negotiations for the purchase of *The New Orleans Item* and took over the controlling interest and active management of the newspaper as its publisher. Since that date, he has devoted virtually his full time to the newspaper business as publisher.

On June 2, 1950 Stern sold to Universal Pictures Co., Inc., all of his "right, title and interest * * * in and to * * * that certain character known as 'Francis' conceived and created by" him, together with all of his rights to the two novels mentioned above and all of his rights to any contracts with respect to the properties conveyed. In con-

sideration of this transfer, Universal agreed to pay him $50,000 plus 5% of the net profits from photoplays based on the character Francis, and 75% of all sums received by Universal under contracts for the use or licensing of the property. Payment of the $50,000 entitled Universal to a "commitment period" of two years within which to make a motion picture. Thereafter, and following release of each picture, Universal was entitled to additional commitment periods by paying a similar fixed consideration of $50,000 as to each picture or period. The contract further provided that "if purchaser shall elect not to pay fixed consideration with respect to any next succeeding commitment period * * * the property shall revert to the seller," all rights in motion pictures produced to remain in Universal. Under this agreement, Universal produced six additional motion pictures [1] in which the character Francis was used. Stern prepared the screen play for the first of these pictures but has had no connection whatever with the writing or production of subsequent pictures except occasionally and incidentally as a consultant. The novel, "Francis Goes to Washington," was not used for screen material.

Plaintiffs have reported as ordinary income for tax purposes all amounts received by them from the sale of the motion picture and publishing rights to the novel "Francis," for preparing a short screen treatment of the book, "Rhubarb," and income received under the agreement for writing screen plays. Only those amounts received from Universal for the character Francis have been treated by plaintiffs as capital gains, accrued during the years received. For the year 1950, the Internal Revenue Service originally accepted plaintiffs' treatment of this income as capital gains from the sale of the character Francis. In considering subsequent years, the Appellate Division of the Internal Revenue reopened the return for the year 1950 and ruled that income from the character Francis was not subject to capital gains treatment for the reason that the contract with Universal was not a sale of the character Francis, that if it were, Francis was property held by the taxpayer primarily for sale to customers in the ordinary course of his business and, further, under the provision of Section 210(a) of the Revenue Act of 1950, amending the provisions of Section 117 (a)(1) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 117(a)(1), the character Francis was similar to a copyright, a literary or artistic composition and, therefore, not a capital asset.

Taxpayer has paid the Government the asserted deficiencies in income taxes for the years 1950–53 resulting from the Commissioner's refusal to recognize his treatment of amounts received from Universal Pictures Company pursuant to the contract in suit as a long-term capital gain. Timely claims for refund have been filed and disallowed, after which disallowance this suit was instituted. Taxpayer's position here is the same as it has been since the filing of his original income tax returns. He states that his contract with Universal Pictures Company was a sale of the capital asset, Francis, not in the ordinary course of his business, and, consequently, he is entitled to capital gains treatment of the income received from that sale. The Government here takes the same position taken by the Appellate Division of Internal Revenue Service as well as the Commissioner in his disallowance of the claim for refund.

The question as to whether the taxpayer's contract with Universal Pictures is a sale will be considered first because if it is not a sale, it will be unnecessary to consider the other objections to capital gains treatment of the income made by the Government. It will be noted in the contract that Stern sold all of his interest in the books "Francis," and "Francis Goes to Washington," the character

---

1. In 1949 the first Francis movie was produced. It was based on the novel, "Francis," and the taxpayer here wrote the screen play. Its production, of course, was not pursuant to the June 2, 1950 contract in suit.

Francis, and all rights and pending contracts concerning them. The agreement makes reference to "the full and complete ownership in the property sold, transferred and granted to (Universal) hereunder." It declares that Stern "hereby sells, transfers and conveys * * * all right, title and interest" in the property to Universal and guarantees "the full benefit of (Universal's) full and complete ownership in the property." Obviously, the draftsmen of this contract intended that it be a sale and called it such. Apparently they were familiar also with the one case, Cory v. Commissioner of Internal Revenue, 2 Cir., 230 F.2d 941, which the Government cites as authority for its contention that this agreement is not a sale, because the language of the agreement leaves no doubt that Stern transferred his entire bundle of rights in all the Francis properties, together with rights of future exploitation, to Universal Pictures. Thus this agreement is different from the agreement under consideration in Cory v. Commissioner, supra, because there the agreement provided for "a transfer of a part of the cluster of rights" inhering in the taxpayer. Cory v. Commissioner, supra, at page 944.[2]

The Government's suggestion, without citation of authority, that the contract in suit is not a sale because it provided for contingent payments of indeterminate sums similar to royalties, and because the property reverted back to Stern if the fixed consideration for any period is not paid, cannot convert this contract of sale into a licensing agreement. Perhaps a sale which provides for contingent payments of indeterminate sums and reversion does violence to the doctrinaire concepts of what a sale should be. But the tax cases[3] interpreting Section 117 of the Code have so long and so consistently held such contracts to be sales that the Internal Revenue Service itself in a recent ruling[4] is now indicating its acquiescence in this classification.

The Government next contends that if the contract in suit is a sale, then the income therefrom is still not entitled to capital gains treatment because it was a sale of "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Section 117(a)(1)(A), Internal Revenue Code of 1939. The resolution of this question depends on appraisal of the total factual situation. Smith v. Commissioner of Internal Revenue, 5 Cir., 232 F.2d 142; Consolidated Naval Stores Company v. Fahs, 5 Cir., 227 F. 2d 923. Unquestionably, under Section 117(a) of the Code, a taxpayer may have more than one business. Snell v. Commissioner of Internal Revenue, 5 Cir., 97 F.2d 891. Before any business can come within Section 117(a), however, it must be an "occupational undertaking which required the habitual devotion of time, attention or effort with substantial

---

2. The full text, pertinent here, from Cory v. Commissioner, supra at page 944, reads:
   "We do not now decide that a transfer by a citizen of but a part of the bundle for a definite sum, or a transfer of the whole for an indeterminate sum, is a sale for purposes of Section 117. We do hold that when, as here, the transfer is both (1) a transfer of a part of the cluster of rights and (2) for an amount wholly indeterminable at the time of the transfer, no such sale occurs."

3. Waterman v. Mackenzie, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923; Rude v. Westcott, 130 U.S. 152, 9 S.Ct. 463, 32 L. Ed. 888; Lawrence v. United States,

5 Cir., 242 F.2d 542; Massey v. United States, 7 Cir., 226 F.2d 724; Watson v. United States, 10 Cir., 222 F.2d 689; Allen v. Werner, 5 Cir., 190 F.2d 840; Briggs v. Hofferbert, D.C., 85 F. Supp. 941, 944, affirmed 4 Cir., 178 F.2d 743; Commissioner of Internal Revenue v. Celanese Corp., 78 U.S.App.D.C. 292, 140 F.2d 339; Commissioner of Internal Revenue v. Hopkinson, 2 Cir., 126 F.2d 406; First National Bank of Princeton v. United States, D.C., 136 F.Supp. 818; Gershwin v. United States, Ct.Cl., 153 F. Supp. 477, 480; Herman Shumlin, 16 T.C. 407; Carl G. Dreymann, 11 T.C. 153; Edward C. Myers, 6 T.C. 258.

4. I.R.S., TIR–81, 6–27–58.

regularity." Thomas v. Commissioner of Internal Revenue, 5 Cir., 254 F.2d 233, 237. The criteria in making this determination are fully set forth in opinions by the Fifth Circuit[5] so it would serve no useful purpose to repeat them here. Those cases do show that a court should not be quick to put a man in business under Section 117(a) simply because he has been successful in earning extra income through a hobby or some other endeavor which takes relatively small part of his time.

Here the taxpayer is a newspaper publisher and has been, with the exclusion of the war years, actively directing newspapers since 1938. Virtually his entire time has been given to that endeavor. As a hobby he has written a few short stories, some of which have been productive of small amounts of income. On two occasions he has written screen plays. He has created the character Francis and written two novels about it. This literary work has taken relatively little of his time. It was more or less a relaxation from his principal employment. Under the circumstances, it can hardly be said that the taxpayer created "Francis" to hold as "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."[6] Section 117(a) (1)(A), I.R.C., 1939.

The Government makes much of the fact that in one of the schedules attached to taxpayer's return, he professes to be a writer. Even if the taxpayer were responsible for this statement, his literary license in this regard should not be allowed to affect the tax treatment accorded his income.[7] Actually, the indication of Stern as a writer was the work of the accountant who prepared the return. It is further noted that the schedule on which the profession appears relates to income and expenses attendant his writing. On the first page of each return in the space provided for "Occupation," the word "Publisher" appears.

Finally, and unfortunately for the taxpayer, the Government's position on the 1950 amendment to the 1939 Code is well taken. That amendment excludes from capital gains treatment income from the sale of "a copyright; a literary, musical, or artistic composition; or similar property" held by "a taxpayer, whose personal efforts created such property." The purpose of this amendment is obvious. It is intended to deny capital gains treatment to income from the sale, by their creator, of literary, musical, or artistic compositions, or similar property. Prior to 1950, various rulings of the Internal Revenue Service had approved capital gains treatment of various literary, musical and artistic compositions, including books and radio programs. Congress determined to eliminate such treatment for such compositions.[8] Hence the amendment.

The taxpayer contends that the character "Francis" is not covered by the amendment, that it is not subject to copyright, that it is not a literary, musical or artistic composition or similar property. He argues that he has paid his taxes at the regular rates on all his income from his writings. He states that the character "Francis" is an "intellectual conception" and that as such the income from the sale thereof is entitled to capital gains treatment.

5. Gamble v. Commissioner of Internal Revenue, 5 Cir., 242 F.2d 586; Smith v. Dunn, 5 Cir., 224 F.2d 353.

6. The Court has considered the cases cited by the Government on this point and finds them all factually distinguishable. See Rider v. Commissioner of Internal Revenue, 8 Cir., 200 F.2d 524; Goldsmith v. Commissioner of Internal Revenue, 2 Cir., 143 F.2d 466; Fackler v. Commissioner of Internal Revenue, 6 Cir., 133 F.2d 509; Snell v. Commissioner, supra.

7. See Thomas v. Commissioner of Internal Revenue, supra, 254 F.2d at page 237, wherein it is stated that the designation of the occupation of the taxpayer on his income tax returns is "of little significance in fixing the character of the holding of the property * * * sold by him."

8. See 1950 U.S.Code Congressional Service, pp. 3097, 3140 and 3230.

The taxpayer cites several cases [9] in support of his position that the character Francis is not subject to being copyrighted. And he spends much time in his brief arguing that the Internal Revenue Service itself has limited the words of the statute "or similar property" to property capable of being copyrighted.[10] It is not necessary for this Court to appraise the taxpayer's citations, his argument on this point, or the counter citations [11] and argument of the Government. It is this Court's view that the character Francis, irrespective of its susceptibility to copyright, is "a literary composition" and as such the income from the sale thereof is not entitled to capital gains treatment. The taxpayer concedes, as he must, that the novel, "Francis," in which the character Francis is the leading figure, is a literary composition, but he argues that Francis, the principal characterization in the book, is not. In this he is mistaken. The character Francis gets its definition and its delineation from the book. The literary description in the book composes the character. How can it be said that the book is a literary composition yet the main character delineated therein is not? A slice of the loaf is still bread. It would be absurd to attribute to Congress the intention, under the 1950 amendment, of covering whole literary compositions but not parts thereof, particularly in view of the catchall, "or similar property," which appears at the end of the amendment.

Without the literary description of Francis, his mannerisms and his manifestations, Francis would cease to exist. In any event, an amorphous Francis could hardly be called "property held by the taxpayer," the sale of which is entitled to capital gains treatment. Section 117(a)(1), I.R.C., 1939. If Francis is, as taxpayer suggests, an "intellectual conception," sans form and substance, existing in the mind alone, it is incapable of ownership and, therefore, of being "property held by the taxpayer." See Holmes v. Hurst, 174 U.S. 82, 86, 19 S.Ct. 606, 43 L.Ed. 904; Nichols v. Universal Pictures Corporation, 2 Cir., 45 F.2d 119, 121. If Francis has sufficient form and substance to be considered property capable of ownership, this is so because of its literary composition. Compare Warner Bros. Pictures v. Columbia Broadcasting System, 9 Cir., 216 F.2d 945.

The taxpayer is entitled to capital gains treatment on the income from the contract in suit for the year 1950 because the 1950 amendment to the Code does not apply to income received during that year.[12] As to subsequent years,

9. Bobbs-Merrill v. Straus, 2 Cir., 147 F. 15, 15 L.R.A.,N.S., 766, affirmed 210 U.S. 339, 28 S.Ct. 722, 52 L.Ed. 1086; Warner Bros. Pictures v. Columbia Broadcasting System, 9 Cir., 216 F.2d 945, 948, certiorari denied 348 U.S. 971, 75 S.Ct. 532, 99 L.Ed. 756; Universal Pictures Co. v. Harold Lloyd Corp., 9 Cir., 162 F.2d 354, 363; Nichols v. Universal Pictures Corp., 2 Cir., 45 F.2d 119, 121; Dymow v. Bolton, 2 Cir., 11 F.2d 690; Chappell & Co., v. Fields, 2 Cir., 210 F. 864; Savage v. Hoffmann, C.C., 159 F. 584; Bloom & Hamlin v. Nixon, D.C., 125 F. 977.

10. The taxpayer refers to that portion of the Treasury Regulations (Treas.Reg. 118, Secs. 39.117(a)–1) which reads as follows:

"The phrase 'similar property' includes, for example, such property as a theatrical production, a radio program, a newspaper cartoon strip, or any other property eligible for copyright protection (whether under statute or common law)."

But see Section 3797(b) of the Internal Revenue Code, 26 U.S.C.A. § 3797(b), which reads:

"The terms 'includes' and 'including' when used in a definition contained in this title shall not be deemed to exclude other things otherwise within the meaning of the term defined."

11. Lone Ranger, Inc. v. Cox, 4 Cir., 124 F.2d 650; Fleischer Studios v. Ralph A. Freundlich, Inc., 2 Cir., 73 F.2d 276; King Features Syndicate v. Fleischer, 2 Cir., 299 F. 533; Wilson v. Haber Bros., 2 Cir., 275 F. 346; Hill v. Whalen & Martell, Inc., D.C., 220 F. 359.

12. In the Report of the Senate Finance Committee accompanying that legislation it is stated (S.Rep. No. 2375, 81st Cong.,

however, capital gains treatment of the income from the contract must be denied as proscribed by that amendment.

Judgment accordingly.

2d Sess., p. 85 (1950–2 Cum.Bull., 483, 544)):

"In the case of the sale prior to the effective date of the amendment, of an artistic work by a creator who has elected the installment basis under Section 44 [26 U.S.C.A. § 44], the tax treatment of installment payments received after such effective date will be governed by the rule of Snell v. Commissioner, (5 Cir., 97 F.2d 891)."