HAROLD L. REGENSTEIN AND STEPHANIE W. REGENSTEIN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 74912. Filed October 31, 1960.

*Michael Kaminsky, Esq.*, for the petitioners.
*Victor H. Frank, Jr., Esq.*, for the respondent.

SCOTT, *Judge:* The respondent determined a deficiency in petitioners' income tax for the taxable year 1954 in the amount of $3,740.61. The only issue for decision is whether the amount of $10,000 received by Harold L. Regenstein in 1954 from the Metropolitan Life Insurance Company is taxable as ordinary income rather than as long-term capital gain.

#### FINDINGS OF FACT.

The petitioners are husband and wife whose income tax return for the year 1954 was filed with the district director of internal revenue for the Upper Manhattan District of New York.

Harold L. Regenstein, hereinafter referred to as the petitioner, is an insurance agent and consultant whose primary contract is with the Massachusetts Mutual Life Insurance Company. He develops and installs benefit plans and corporate insurance arrangements, and deals in corporate retirement arrangements and other forms of individual and group insurance. He is licensed as an insurance agent in New York State and in several other States. He handles business for insurance companies other than the one with which he has his primary contract and sells any form of insurance contract that is authorized in the States in which he has a license. The major portion of his business is selling insurance contracts of various types to corporations. The petitioner has been in this form of insurance business since 1920.

In the ordinary course of petitioner's business he sells group life insurance. His first work in connection with selling group life insurance is to interest the company he is working with in providing the group insurance for its employees. He then works out a plan of insurance that an insurance company will underwrite. Petitioner presents the plan he has developed for the particular company to a meeting of the officers or board of directors of the company, and he is either successful in making a sale or not. One of the factors discussed with the corporation is the amount of coverage it wants. A common formula for companies is to insure each employee to the extent of 1 year's salary. He may suggest to the company to whom the insurance is being sold the proportion of the cost of the insurance to be paid by it. The insurance company that is issuing the policy makes the rate computations.

In selling ordinary life insurance to a corporation petitioner works with the corporation to fit an insurance plan to the needs of the purchaser's particular business. In selling a personal insurance policy petitioner considers the individual problem of the person proposing to purchase the contract and attempts to coordinate the insurance with the provisions of the individual's will. For the sale of either a group or individual insurance policy petitioner is paid a commission by the insurance company issuing the policy based upon a regular commission scale.

Petitioner maintains an office in which he employs four or five people to do whatever work is necessary in assisting him in preparing plans for group insurance and in the ordinary office work. He has some travel and entertainment expenses in connection with his insurance business.

In 1948 a full-time agent of the Massachusetts Mutual Life Insurance Company by the name of H. Stanley Judd came to petitioner's office and told him that his uncle, John Wesley Clark, had been asked

by friends of his in Washington in the Senate and House of Representatives to find someone to determine whether the private insurance companies would be interested in taking over national service life insurance. At Judd's request petitioner went with him to Washington to meet with Clark. Petitioner met with Judd, Clark, and other persons in Washington and discussed the possibility of interesting the private insurance companies in taking over the national service life insurance business. Petitioner stated that in his opinion the private companies would not be interested in doing this but he agreed that he would make an appointment with the Life Insurance Presidents' Association to discuss the problem. After meeting with representatives of the insurance companies, petitioner reported back to the persons with whom he had previously met in Washington that as he had expected the insurance companies were not interested in taking over the national service life insurance business.

Petitioner then suggested to this same group that the Federal Government should provide group life insurance for its employees. The persons to whom petitioner made this suggestion were very interested in the idea, but expressed doubt that the private insurance companies would cooperate in such an undertaking. Later petitioner attempted without success to interest the president and vice president of the Massachusetts Mutual Life Insurance Company in working with him to develop a plan for group life insurance for Federal Government employees. At their suggestion, petitioner talked with Reinhard Hohaus, the chief group actuary of the Metropolitan Life Insurance Company, in an effort to interest him and his company in working on such a plan. Hohaus told petitioner that he did not have the authority himself to proceed to work on this idea but subsequently called petitioner and told him that his superiors had approved of his going ahead with such work. Petitioner met with Hohaus and they proceeded, with the assistance of one or two of the young lawyers and assistant actuaries of the Metropolitan Life Insurance Company, to work on a plan for group life insurance for Federal Government employees.

When Hohaus and petitioner had developed a plan, they met in Washington with Monroe M. Redden, Member of Congress from the State of North Carolina, and went over their plan with him very thoroughly. It was decided that before any further steps were taken a study should be made to determine the general reaction of the unions in the Federal Government to the plan. Petitioner proceeded to make such a study, and the result thereof showed that the unions were generally favorable to the plan. After making this study, petitioner and Hohaus again presented the matter to Redden, together with the result of the study, and Redden thereafter offered a bill in Congress

proposing a form of group life insurance for Federal Government employees. This bill was never acted upon by Congress.

Petitioner continued to have meetings with Redden. He also met with Hale Boggs, Member of Congress from the State of Louisiana, and later he and Hohaus had meetings with Boggs. Petitioner attended a meeting in Washington with representatives of 35 of the biggest life insurance companies and discussed with them the willingness of the private life insurance companies to cooperate with the Federal Government by underwriting group life insurance for all employees of the Federal Government. The consensus of the meeting was that the private life insurance companies would be pleased to cooperate with the Government on such a group life insurance plan. After this meeting, petitioner made certain revisions in the plan in conformance with the discussions that had taken place at the meeting. The major revision consisted of setting up eight groups of life insurance companies who were in the group-underwriting business with each group headed by one of the large companies. It had been petitioner's idea to have one company manage the entire plan because he felt that would be a much more economical operation, but no one company was willing to take the responsibility as the managing company. Petitioner sent a copy of the modified plan to Redden in Washington. Redden presented this plan in a bill to Congress, but the bill did not pass.

Petitioner kept sending copies of the plan to officials of the Federal Government during the administration of President Truman. After President Eisenhower was elected, petitioner sent a copy of the plan to him with a letter and received an acknowledgment thereof. When petitioner learned that Elliott Caplan had been appointed by President Truman to head a commission making a study of the various pension operations in the Federal Government, he arranged to meet Caplan and told him about the plan for group life insurance for employees of the Federal Government. He sent Caplan a copy of the plan. Thereafter, petitioner had a number of meetings with Caplan who continued in the same position as an appointee of President Eisenhower. Petitioner continued to have meetings with Caplan to discuss the group life insurance plan through the fall of 1953.

During the entire time petitioner was working on the plan for group life insurance for Federal Government employees he did some work in his office and the secretaries in his office did typing on the plan, modifications thereof, and correspondence in connection therewith. Petitioner had some travel expenses in connection with his work on this plan but the greater portion of petitioner's expense was the time he spent on this work.

Petitioner considered the plan developed for group life insurance for Federal Government employees to be unique in two particulars.

First, all of the insurance companies which wrote group policies would have the opportunity for a proportionate participation, thus eliminating any jealousies between companies. Second, there would be no commissions paid on the large amounts of coverage involved. Prior to 1954 there had been no plans undertaken on a nationwide basis where every company that had done any group life insurance business at all could have a part in the underwriting on a proportionate formula. Petitioner never sought to have the plan or any portion of it patented or copyrighted.

Congress, on August 17, 1954, enacted a statute generally known as the Federal Employees' Group Life Insurance Act of 1954, ch. 752, 68 Stat. 736. This Act incorporated the basic ideas set forth in the modified plan which petitioner and others, as herein set forth, had been discussing.

In 1948 when petitioner, Hohaus, Judd, and others first discussed the idea of a plan for group life insurance for Federal Government employees, they also discussed the idea of insurance commissions. They recognized that regular commissions would be impossible because of the large amount of money involved. In the early days of discussing the plan, all of those interested were searching not only for a plan and how to present it and get the insurance companies interested, but for some method of compensation for the time that various individuals would put into work on such a plan. At the beginning the question of compensation was one that had no definite pattern. Petitioner felt that some way would have to be found of compensating in some manner for the time that individuals put into working on this plan. After the enactment of the Federal Employees' Group Life Insurance Act of 1954, petitioner did not ask for a commission or a consultation fee since it was his opinion that under the provisions of the bill he could not be paid a commission.

Petitioner told Hohaus that he wanted some recognition for the work he had done on the bill. Petitioner wanted to write an article for the newspapers to get some publicity for the work he had done. Hohaus told petitioner that he could not do this, that such publicity was impossible. Petitioner felt that the recognition he sought would enhance his reputation and that such publicity would place him in a favorable position with the various companies with which he did business. Petitioner continued to discuss his desire for recognition and publicity in connection with his work on the plan for Federal Government employees' group life insurance with Hohaus. He also discussed this desire for public recognition with Ken Beck, president of the Massachusetts Mutual Life Insurance Company, and with Henry Biers, president of Aetna Life Insurance Company.

While petitioner was still pursuing his discussions with various persons connected with insurance companies relative to his desire to ob-

tain publicity for his work in connection with the plan for group life insurance for Federal Government employees, he was given a draft of a document and asked to look it over and show it to his lawyer. Petitioner showed the draft of the document to his lawyer who suggested a few changes. Petitioner returned the document to the person who had given it to him with the suggested changes and a redraft was made with certain changes in the language. The redraft of this document was executed by petitioner and turned over by him to someone connected with the Metropolitan Life Insurance Company. The document executed by petitioner, after reciting that petitioner asserted and claimed that he, individually, as well as jointly with H. Stanley Judd and John Wesley Clark, prepared and formulated a plan of group life insurance coverage to be issued upon the lives of employees of the United States Government, and that some of the ideas contained in that plan were thereafter embodied in the policy of group life insurance recently issued by the Metropolitan Life Insurance Company and the companies associated with it to the United States Civil Service Commission under and by virtue of the Federal Employees' Group Life Insurance Act of 1954, and that petitioner asserted a valuable right and claim against the Metropolitan Life Insurance Company and associated companies for the use of this plan and all ideas related thereto, provided:

Now, Therefore, for and in consideration of the sum of Ten Thousand Dollars, lawful money of the United States, and other valuable considerations, to me in hand paid by the said Metropolitan Life Insurance Company on behalf of itself and the companies associated with it in said policy, the receipt whereof is hereby acknowledged, I have sold, assigned and transferred to said Metropolitan and the said associated companies all my right, title and interest in and to said plan of and ideas for insurance and said policy of insurance, and in addition thereto I have remised, released and forever discharged, and by these presents do for myself and my heirs, distributees, executors and administrators, remise, release and forever discharge the said Metropolitan Life Insurance Company and the companies associated with it, their successors and assigns, from any and every right and cause of action, claim or demand of whatsoever kind, nature or description, at law or in equity, or created by statute, which against them I now have, or which I, or my heirs, distributees, executors or administrators hereafter can, shall, or may have, for or by reason of any thing whatsoever, from the beginning of the world to the day of the date of these presents, and more particularly, but not exclusively, arising out of the formulation, presentation, solicitation, sale and/or the issuance of the policy of group life insurance issued by the said Metropolitan Life Insurance Company and its associated companies, to the United States Civil Service Commission upon employees of the United States Government under and by virtue of the Federal Employee's Group Life Insurance Act of 1954 (Public Law 598) enacted by the 83rd Congress and approved by the President of the United States on August 17, 1954, excepting, however, any claim arising out of any policy of insurance in which the undersigned is the insured, owner or beneficiary, and any claim he may have for commissions, fees or other compensation on any policy other than the group policy hereinbefore described.

This document was executed by petitioner on October 21, 1954, and the Metropolitan Life Insurance Company on behalf of itself and its associated companies paid the sum of $10,000 to petitioner in the year 1954. On October 21, 1954, petitioner, H. Stanley Judd, and Ethel Hudson Clark, the executrix of the estate of John Wesley Clark, deceased, executed mutual releases of any claims one against the other, reciting that they had jointly and severally agreed to settle their asserted claims against the Metropolitan Life Insurance Company and its associated companies for compensation for use of their plan and ideas for insuring the lives of employees of the Federal Government in consideration of the payment of the sum of $10,000 to each of them.

The $10,000 received by petitioner in 1954 from Metropolitan Life Insurance Company was compensation for services rendered by him to that company and its associated companies.

### OPINION.

Petitioner contends that the $10,000 paid to him in 1954 by the Metropolitan Life Insurance Company on behalf of itself and the companies associated with it was a long-term capital gain received from the sale of his idea or plan for group life insurance for Federal Government employees.

Respondent's position is that the $10,000 was ordinary income to petitioner. Respondent first contends that the payment of the $10,000 to petitioner was not for the purchase of his idea or plan but was in substance, if not in form, payment for services rendered by petitioner. Secondly, respondent contends that petitioner's plan or idea was not a capital asset. Respondent argues that petitioner's idea or plan was not property, but that if it were to be considered property, it is excluded from the definition of capital asset, either as property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business or as property similar to a copyright, literary, musical, or artistic composition.[1]

---

[1] Section 1221 of the Internal Revenue Code of 1954 provides:

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

\*     \*     \*     \*     \*     \*     \*

(3) a copyright, a literary, musical, or artistic composition, or similar property, held by—

(A). a taxpayer whose personal efforts created such property, or

(B) a taxpayer in whose hands the basis of such property is determined, for the purpose of determining gain from a sale or exchange, in whole or in part by reference to the basis of such property in the hands of the person whose personal efforts created such property;

Section 1222 of the Internal Revenue Code of 1954 provides:

For purposes of this subtitle—

\*     \*     \*     \*     \*     \*     \*

(3) LONG-TERM CAPITAL GAIN.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income.

While there exists grave doubt here whether petitioner's plan or idea was one that could be considered to be property, cf. *J. Irizarry y Puente* v. *President & F. of Harvard Col.*, 248 F. 2d 799 (C.A. 1, 1957), affirmed per curiam 356 U.S. 43, and *Wilkinson* v. *New York Cent. R. Co.*, 16 N.Y.S. 2d 217 (App. Div. 1939); and, further, if it were considered property, whether it would not come within the exclusion of property similar to a copyright, literary, musical, or artistic composition,[2] cf. *Stern* v. *United States*, 164 F. Supp. 847, affirmed per curiam 262 F. 2d 957 (C.A. 5, 1958), certiorari denied 359 U.S. 968, we need not decide these questions, since in our view the facts taken as a whole support respondent's contention that the payment was for services rendered by petitioner to Metropolitan and its associated companies.

As shown by our findings, one of the problems discussed at the time work was started on the plan for life insurance coverage for Federal employees was some method of compensating those persons who worked on the plan for the time spent in such work. After the law providing for this insurance coverage had been enacted, petitioner wished to receive public recognition for the work that he had done. Petitioner thought such public recognition would be a form of compensation for his work in that it would enhance his reputation and place him in a favorable position with the companies with which he transacted business. Petitioner in his testimony gave no explanation of why it was not possible for him to obtain this publicity other than to say that Hohaus stated it was impossible. As a result of petitioner's persistent requests for recognition of the work he had done, made to Hohaus and representatives of other insurance companies, the offer to pay petitioner $10,000 was made. The evidence fails to show any value that petitioner's idea or plan had to the alleged purchasers at the time the document which petitioner signed agreeing to the $10,000 payment was executed. At that time the final plan had been incorporated into a Federal law and the insurance companies had obtained their underwriting business in accordance with

---

[2] Petitioner argues that under section 1.1221–1 of respondent's Income Tax Regulations similar property as used in section 1221 of the 1954 Code is limited to property eligible for copyright protection and further states that petitioner's plan was not so eligible. We do not deem it necessary to pass upon petitioner's argument but note that respondent disagrees with the restricted construction placed on this section by petitioner. The arguments of each party here appear to be comparable to those not passed upon by the court in *Stern* v. *United States*, 164 F. Supp. 847, 852, fn. 10. Petitioner in his testimony made references to mailing copies of the plan to various persons and also a reference to some publication thereof. In his brief he states without citation of authority that "the property which was created by the intellectual efforts of Regenstein and his long-time loyalty to the idea which induced him to continue working until the idea was translated into reality was not property which was eligible for copyright protection." If the alleged capital asset is petitioner's idea disassociated from the written plan, it is most questionable whether this idea could be considered property. Apparently the written manuscript of the plan is not the alleged property to which petitioner has reference. If it is, petitioner has cited no authority for his statement that this writing prior to its publication would not have been eligible for a copyright.

that law. Insofar as the evidence shows, the only thing of value that Metropolitan and its associated companies received was a release of any claim or action that petitioner might have for compensation for his services in developing a plan or idea which resulted in the insurance companies' issuing the policy covering group life insurance for Federal Government employees.

The document that petitioner gave to Metropolitan and its associated companies, although referring to a sale of the plan or idea, also released these companies from any claim or demand of any kind which petitioner had to that date and more specifically from any claim petitioner might have "arising out of the formulation, presentation, solicitation, sale and/or the issuance of the policy of group life insurance issued by the said Metropolitan Life Insurance Company and its associated companies * * * excepting, however, * * * any claim * * * for commissions, fees or other compensation on any policy other than the group policy hereinbefore described." This portion of the document clearly releases the insurance companies from any claim petitioner had for services rendered in connection with group life insurance for Federal Government employees.[3]

The case of *Estate of Douglas Chandor*, 28 T.C. 721 (1957), upon which petitioner relies is distinguishable from the instant case. The artist in the *Chandor* case had painted a portrait with no idea at the time of selling it. Subsequently he did sell the portrait. Since the portrait was of a person other than the person to whom it was sold, no question was presented whether the payment was for services rendered. The payment received was from the sale of the portrait which was the property of its creator. The sole question in the *Chandor* case was whether this portrait was excluded from the definition of capital asset as property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.[4]

Petitioner on brief argues that the type of transaction here involved is commonly regarded as a sale stating: "It has never been regarded as compensation for services or compensation for the use of property.

---

[3] Petitioner stresses his desire to obtain publicity for his idea and for his work on the plan. However, there is nothing in the document executed by petitioner that specifically prohibits him from publicizing the fact that he was one of the originators of the idea of group life insurance for Federal Government employees. If the reason for the payment of $10,000 had been to prohibit petitioner's publicizing the fact that he claimed to be one of the originators of the idea or plan of group life insurance for Federal Government employees, it is reasonable to assume that petitioner would have specifically agreed that he would not publicize this fact. There is nothing in the description of petitioner's claim against the Metropolitan Life Insurance Company and its associated companies in the mutual releases signed by petitioner, Judd, and Clark's executrix to indicate that the payment is for any release of petitioner's right to publicize his part in working out a plan for group insurance for Federal Government employees. This document refers only to the claim for compensation for the use of the plan or ideas.

[4] The section of the Code excluding from the definition of capital asset a copyright, literary, musical, or artistic composition or similar property was not applicable to the year 1948 involved in the *Chandor* case.

(Cf. *Commissioner* v. *Gillette Motor Transport, Inc.* — U.S. — (June 27, 1960) )."

The Supreme Court, in the *Gillette* case, in affirming a Memorandum Opinion of this Court, stated:

While a capital asset is defined in § 117(a)(1) as "property held by the taxpayer," it is evident that not everything which can be called property in the ordinary sense and which is outside the statutory exclusions qualifies as a capital asset. This Court has long held that the term "capital asset" is to be construed narrowly in accordance with the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year. *Burnet* v. *Harmel*, 287 U.S. 103, 106. Thus the Court has held that an unexpired lease, *Hort* v. *Commissioner*, 313 U.S. 28, corn futures, *Corn Products Co.* v. *Commissioner*, 350 U.S. 46, and oil payment rights, *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260, are not capital assets even though they are concededly "property" interests in the ordinary sense. And see Surrey, Definitional Problems in Capital Gains Taxation, 69 Harv. L. Rev. 985, 987–989 and Note 7.

Any claim which a taxpayer has regardless of the circumstances from which it arose might, in the broad sense of the term, be considered property. However, for Federal income tax purposes, it is the nature of the claim which is compromised that determines whether the amount received is ordinary income or capital gain. *Harry L. Booker*, 27 T.C. 932 (1957).

Here petitioner had, with the knowledge and cooperation of Metropolitan and other insurance companies, assisted in working out an insurance plan which resulted in those insurance companies underwriting group life insurance for Federal Government employees. The fact that petitioner's claimed idea or plan was stated to be sold to the insurance companies in the same document which generally released those companies from any claim petitioner might have against them, does not change the fact that the only thing of value which the insurance companies had received was petitioner's services. Cf. *Arthur N. Blum*, 11 T.C. 101 (1948), affd. 183 F. 2d 281 (C.A. 3, 1950).

Upon consideration of all the facts of record, we hold that petitioner received the $10,000 payment for services rendered and that it is ordinary income to him.

*Decision will be entered for the respondent.*

