J ONES, Senior Judge,
delivered the opinion of the court: Plaintiffs[1] seek to recover alleged overpayment of Federal income tax for the year 1955. The single question for our determination involves the right of plaintiff to long term capital gain treatment for a sum of $7,500.
Sometime between 1938 and 1939, plaintiff conceived and invented a format or structure for a radio program. This format was based upon a mathematical formula under which a sponsor would be able to give away an unlimited amount of money, on a progressive basis, to contestants in a quiz show. Briefly, the formula allowed a contestant to parlay and progressively double the money he had previously won by giving correct answers to successive questions. Two friends who were employed by a radio station had pointed out to plaintiff that a “Dr. I.Q.” radio program was deficient in that it was not capable of giving away enough money to contestants. Plaintiff’s formula was designed to overcome this defect.
In May and June of 1939, plaintiff had applied to the Copyright Office of the Library of Congress in Washington, D.C., for copyright protection of his radio and theater quiz program. The Copyright Office replied that it was not possible to copyright either the name of a radio program or the essential feature of the proposed program.
In July of 1939, plaintiff disclosed his format to the sales manager of a radio station in Atlanta, Georgia, who then wrote to Young and Bubican, Inc., of New York City, in an effort to sell plaintiff’s idea. No sale was made as a result of this effort. Hearing that The Biow Company was searching for a radio program, plaintiff wrote that company on January 27, 1940, and submitted his prospectus for a radio program “Double or Nothing” for consideration. The prospectus contained the notation “Copyright — September 12, 1939. Peter G. Cranford”, but plaintiff stated in the ac- *48 companymg letter that be bad been informed that be would not be able to obtain a copyright on the structure of the program. As a result, The Biow Company sent plaintiff a contract covering his format for the radio program. Plaintiff signed this contract on February 8,1940, which provided that in consideration of 'a payment of $75 by The Biow Company, plaintiff assigned and conveyed to The Biow Company all of his title and interest in “Double or Nothing” and in the radio program conceived and invented by him. The Biow Company stated in the contract, however, that in the event of commercial success, the company would recognize a moral obligation to pay plaintiff such further consideration as The Biow Company shall determine in its sole and uncontrolled discretion. Thereafter, the name of the program was changed to “Take It or Leave It” and it was successfully put on the air over a number of Columbia Broadcasting System stations. Under the moral obligation clause of the contract, The Biow Company and plaintiff arranged for certain additional weekly payments to plaintiff during the life of the radio program.
Subsequently, plaintiff read in a magazine that The Biow Company was negotiating with Columbia Motion Pictures for the sale of the motion picture rights to the program. Plaintiff then wrote The Biow Company, taking the position that the only rights he had sold were the rights in the radio program. After further negotiations, a contract was entered into by the parties on June 25,1942, which confirmed and ratified that the initial contract of February 8, 1940, transferred all rights of every kind, including radio, television and motion picture rights. This second contract provided, however, that The Biow Company would pay to plaintiff one-third of the payments received by The Biow Company in connection with the licensing of the use of the program. The present controversy concerns payments made to plaintiff pursuant to this second contract.
On January 1,1944, The Biow Company assigned all of its rights in connection with the name “Take It or Leave It” and related matters to Take It or Leave It, Inc. This assignment was made subject to plaintiff’s right to receive one-third *49 of the payments derived from licensing activity. Take It or Leave It, Inc. then entered into a license agreement with Lonis G. Cowan, Inc. on March 4, 1955, under which the licensee Louis G. Cowan, Inc. was given the sole and exclusive right to produce a television program based upon the idea and title “Take It or Leave It.” Under this license agreement, Take It or Leave It, Inc. was to receive 50 percent of the net profits made by the licensee, Louis G. Cowan, Inc. Pursuant to the license agreement, Louis G. Cowan, Inc. produced a television program entitled “The $64,000 Question.” During 1955, Louis G. Cowan, Inc. paid to Take It or Leave It, Inc. $22,500. Of this amount, plaintiff received his one-third share, or the sum of $7,500.
Plaintiff’s amended Federal income tax return for the year 1955, filed jointly with his wife on July 23, 1956, included the $7,500 as income and plaintiff paid the tax due thereon. On August 23, 1957, plaintiff filed a claim for refund based on the contention that the $7,500 received by him during 1955 was a gain from the sale of a capital asset and income tax should have been paid on that basis. Plaintiff’s claim for refund was disallowed on August 9,1960.
It is the plaintiff’s contention that the format for a radio or television program, which he invented, is a property distinct from the radio program itself. Plaintiff further contends that since this property is not copyrightable, it is not within the exclusionary provision of § 1221(3) of the Internal Bevenue Code of 1954 and, therefore, it qualifies as a capital asset under the general rule of § 1221. Therefore, plaintiff concludes, he is entitled to capital gain treatment for the $7,500 received in 1955.
The Government contends that the amount in question should be treated as ordinary income for several reasons. First, the Government says that the term “property” in § 1221 of the 1954 Code should not be construed to include an abstract idea. Secondly, the Government contends that plaintiff’s idea for a radio show is outside of the statutory definition of a capital asset because it is excluded by § 1221(3) under the term “similar property.” Finally, the Government urges that plaintiff is not entitled to long term *50 capital gain treatment because he has not proved a six-month. holding period.
The pertinent parts of § 1221 of the 1954 Code are:
For purposes of this subtitle, the term “capital asset” means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
$ $ ‡ ‡ $
(3) a copright, a literary, musical, or artistic composition, or similar property, * * *. [Emphasis supplied.]
It is the Government’s contention that plaintiff’s format or idea is not “property” or that if it is “property” then it is “similar property” within the meaning of § 1221. The Government has cited two cases wherein the courts have expressed considerable doubt as to whether an abstract idea could be considered to be “property” for capital gain purposes.[2] Stern v. United States, 164 F. Supp. 847, 852 (E.D. La. 1958), aff’d per curiam, 262 F. 2d 957 (5th Cir. 1958), cert. denied, 359 U.S. 969 (1959); Harold L. Regenstein, 35 T.C. 183, 190 (1960). In Begenstem, the taxpayer therein had received $10,000 from the Metropolitan Life Insurance Company for his idea or plan for selling group life insurance to Federal Government employees. Although the Tax Court voiced its doubts as to whether the plan or idea could be considered to be property, that issue was specifically left undecided because the court found that the payment was for services rendered by Eegenstein to the life insurance companies. In the Stem case the taxpayer wrote the novels about “Francis” the talking mule. The taxpayer, Stern, sold his interest in the character “Francis” to the Universal Pictures Co., Inc. Thereafter, Stem claimed the payments he received from that sale as capital gain. The District Court in that case held that the character “Francis” was a “literary composition” because without the literary *51 description of Francis, the character would cease to exist. It is true that the District Court’s opinion in Stem contained language which suggested that “intellectual conception,” sans form and substance, is incapable of ownership and, therefore, of being “property held by the taxpayer.” However, the court there was speaking of a literary character described in copyrighted novels.
We find it unnecessary to decide the question of whether plaintiff’s format is or is not “property” because we are of the opinion that plaintiff’s idea is within the definition of the term “similar property” in § 1221(3) of the 1954 Code.
Section 1221(3) of the 1954 Code was first introduced into the tax law by section 210(a) of the Revenue Act of 1950, 64 Stat. 906, 933. The legislative history of this provision shows that the Congress intended to close a loophole with respect to capital gain treatment. Prior to the enactment of section 210(a) of the 1950 Act, the tax treatment of a sale of a copyright or book depended on the professional status of the author. If the author was a writer by profession, then the sale resulted in ordinary income; if he was an amateur, then the sale produced capital gain. See the discussion in Surrey and Warren, Federal Income Taxation 753-754 (1962). The Committee Reports for the Revenue Act of 1950 show that the Congress intended to provide uniform ordinary income treatment for the sale of a product created by personal effort. See Senate Finance Committee Report, S. Rep. No. 2375, 81st Cong., 2d Sess. 43, 83-84 (1950) ; House Committee on Ways and Means Report, H. Rep. No. 2319, 81st Cong., 2d Sess. 54, 91-92 (1950).
There is no question that plaintiff’s idea or format was the product of his personal effort. To escape the application of § 1221(3) of the 1954 Code, plaintiff contends that his format is neither “a copyright, a literary, musical, or artistic composition” nor a “similar property.” Plaintiff says that the term “similar property” as used in § 1221(3) means property similar to those specifically named which are all property eligible for copyright protection. To support *52 bis contention, plaintiff quotes from the Senate Finance Committee Report, supra, the following statement:
The amendment * * * will also exclude from the capital asset category any property similar to that specifically named; for example, a radio program which has been created by the personal efforts of the taxpayer.
Plaintiff also points to Regulations § 1.1221-1 (c):
For purposes of section 1221(3), the phrase “similar property” includes, for example, such property as a theatrical production, a radio program, a newspaper cartoon strip, or any other property eligible for copyright protection * * *. [Emphasis added.]
Thus, plaintiff concludes that since his format is not copyrightable and is not one of the specifically named items, the format is not excluded from the definition of a capital asset by §1221(3).
The quoted language in the Regulations need not detain us long. In the first place, the statement was qualified by the words “includes” and “for example.” As the Government correctly pointed out, § 7701(b) of the 1954 Code provides:
The terms “includes” and “including” when used in a definition contained in this title shall not be deemed to exclude other things otherwise within the meaning of the term defined.
It is to be presumed that the Regulations, in explaining the statutory language, would also conform itself to the definitions given therein. Furthermore, Regulations contrary to the intent of the Congress, if such is the case here, obviously cannot stand.
The statement from the Senate Finance Committee Report, quoted by plaintiff, refers to “property similar to that specifically named.” Obviously, this language does not limit the “similar property” to those already enumerated or there would be no reason to add this category at all. We believe that the limitation is disclosed by the adjective “similar.” In other words, properties having important characteristics common to those named items are “similar *53 property” within the meaning of the statute. Our task here is to identify those important common characteristics.
Plaintiff is aware of the above interpretation, as he is contending that the important common characteristic of the named items is their entitlement to copyright protection. We disagree with this contention. It seems to us that the important point common to the specified categories, aside from their artistic nature, is that they are all products of personal effort. Plaintiff has not shown us any reason why copyrightable property should be singled out and be denied capital gain treatment while products of personal effort which are not subject to copyright should enjoy a tax advantage. On the contrary, capital gain treatment is an exception to the normal rule and the definition of a capital asset must be narrowly applied, Corn Products Co. v. Commissioner, 350 U.S. 46, 52 (1955), and the Committee Reports associated with the Revenue Act of 1950 make it clear that the provision here in question was intended to apply against products of personal effort. See Senate Report, supra, pp. 43 and 83, and House Report, supra, pp. 54 and 92. In addition, the “Summary of H.R. 8920 as Agreed to by the Conferees,”[3] states:
Section 210 provides that when any person sells a copyright, a literary, musical, or artistic composition, or similar property which is the product of his personal effort, his income from the sale is taxed as ordinary income. [Emphasis added.]
From the foregoing discussion we conclude that all types of artistic works which are products of personal effort and skill are excluded from the definition of a capital asset, by virtue of the term “similar property,” unless specifically excepted. It is beyond dispute that a radio program itself is within the definition of a “similar property.” We see no relevant distinction between a radio program and a format for the radio program for the purpose of the definition of a “similar property.” Accordingly, we conclude that plaintiff’s format is not a capital asset.
*54 In view of our holding that plaintiff’s format for a radio program is not a capital asset by virtue of the exclusionary provision of § 1221 (3), we need not pass on the Government’s final contention that plaintiff has not proved a six-month holding period.
Plaintiffs are not entitled to recover. Their petition is dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Wilson Cowen (now the Chief Judge), and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiffs, Peter G. Cranford and Helen Cranford, are husband and wife, who reside in Augusta, Georgia. Peter G. Cranford will be hereinafter referred to as plaintiff.
2. The plaintiff is a practicing psychologist, and has been so engaged since 1949. He graduated from the University of Florida with an M.A. degree in 1933. From 1933 until 1949, he held various jobs working for the Y.M.C.A., a hotel, as a teacher, as Director of Research for the Georgia Education Association, and as a Government employee with the Social Security Board, the Office of Emergency Management, and the U.S. Public Health Service. He received his degree as a Doctor of Philosophy from the University of Texas in 1949.
3. A short time prior to July 26, 1939, plaintiff conceived and invented a format or structure for a radio program, based upon a mathematical formula under which a sponsor would be able to give an unlimited amount of money on a progressive basis. The formula provided for increased amounts of money as a reward to a contestant, since if he could give correct answers to successive questions, he would be able to parlay and progressively double the money he had previously won. Plaintiff began, work on the idea about September 12, 1938. Two friends who were employed by Radio Station WGST in Atlanta, Georgia, pointed out to him that the “Dr. I.Q.” radio program, which went on the air over a nationwide network on April 10,1939, was deficient in that it was not capable of giving away enough money to *55 contestants. His formula was designed to overcome this defect.
4. On May 15, 1939, plaintiff wrote the Library of Congress, Copyright Office, Washington, D.C., stating that in his examination of the copyright regulations, he had found no provision for copyrighting the name or structure of'a radio program which was not of a musical or dramatic nature. He requested appropriate blanks for copyrighting a radio and theater quiz program. On May 20, 1939, the Register of Copyrights replied :
In reply to your letter of May 15, you are informed that there are no provisions in the copyright law under which the name or (probably) the structure of a radio program may be protected. The present copyright law was enacted before the advent of radio broadcasting. It enumerates certain classes of copyrightable works. If a work falls under some one of these classes it may be registered accordingly. Radio programs, so far as they are copyrightable, usually come under Class D, Dramatic Compositions, or C, Lectures, addresses, etc., prepared for oral delivery. The idea or method of arrangement of the program are not believed to be within the scope of protection.
Copies of forms for unpublished dramatic compositions and lectures, addresses, etc., are enclosed. If in your opinion neither of these forms is appropriate for your “Radio and Theatre Quiz Program,” perhaps you can send a sample copy for examination by the Copyright Office for determination of whether it is copyrightable and under what class.
On May 27, 1939, plaintiff again wrote the Register of Copyrights as follows:
Inasmuch as it appears that the structure of my proposed radio program is not copyright material, I should like further to ask if it will be possible to copyright the following three names: Freeze, Drag, Latch On. I am planning on using one or all of these titles for a radio-theatre quiz program. The essential feature of the program will be the asking of a series of questions to members of a theatre audience and to double the amount of prize money with each succeeding correct answer. If a correct answer is not given, no money is awarded. The participant may call “freeze”, etc, at any given point, take his winnings, and give up his right to try any *56 further questions. I should like to know how many such indicative titles such as the above could be copyrighted.
On June 14, 1939, the Register of Copyrights replied in pertinent part as follows:
In the letter of this Office of May 20, it was explained that copyright does not protect the name of a radio program. It is accordingly impossible to copyright the names “Freeze,” “Drag,” and “Latch On,” as suggested in your letter. Neither is it possible to protect under the copyright law the essential feature of your proposed radio programs, consisting of asking a series of questions, giving prizes for the answers, doubling each successive prize for a correct answer, and so on.
5. About July 26, 1939, plaintiff described to Frank Gaither, sales manager of Radio Station WGST in Atlanta, plaintiff’s format or structure for a radio program. By letter of July 26, 1939, Mr. Gaither wrote Young and Rubi-cán, Inc., of New York City, in an effort to sell plaintiff’s idea. The letter stated that a brief of the idea was attached to the letter, but plaintiff has no copy of this document and it is not in evidence. No sale was made as a result of this effort.
6. Prior to January 27, 1940, plaintiff learned from John Outtler, sales manager of Radio Station WSB of Atlanta, Georgia, that The Biow Company, Incorporated, was searching for a radio program. As a result on January 27, 1940, plaintiff wrote William Chalmers of The Biow Company, enclosing a complete prospectus of “my projected radio program ‘Double or Nothing’,” and stating that he had been informed that he would not be able to obtain a copyright on the structure of the program.. Plaintiff’s enclosed written prospectus was entitled:
PROPOSAL FOR RADIO PROGRAM
Copyright — September 12, 1939 Peter G. Cranford,
and the text thereof read as follows:
1. The Title: “Double-or-Nothing”, “Freeze”, “Drag”, “Latch-on”, or the trade name or the sponsor or product (Piggly Wiggly, Red Rock, etc.).
*57 2. Type Program: Quiz.
3. Where Presented: Theatres, radio.
4. Type Questions: True and False.
5. Method of Presentation: True and false questions, either submitted by radio fans or composed by the staff, are used. A member of the audience is asked a question. If he answers correctly, he wins one dollar, or any other amount ranging from one cent on up. If he misses, he doesn’t get anything (except perhaps the sponsor’s product, tickets to the show, etc.). He is then given another question. If he gets this, the amount of prize money is doubled, i.e., $2. If he answers all ten questions consecutively, he wins whatever amount one starts off with doubled each time. If he misses anywhere along the route, he gets nothing.
If after the participant answers one or more questions correctly, he does not wish to let “the money ride”, so to speak, he can say “Freeze”, take his winnings thus far, and the announcer goes to the next participant. Instead of the word “Freeze” any suitable word could be used. The sponsor’s name or trademarked product would do just as well.
If the participant takes another question and misses, he gets only the sponsor’s product, two tickets to the show, etc. If the sponsor is a grocery chain, certificates of credit instead of money could be given out. This would work especially well with women. A department store might limit the prizes to hosiery, shirts, etc.
6. Cost: The cost of the program is highly variable as will be seen from the table given below. It is not necessary to begin with $1. The prizes can begin at one cent or at $5 in accordance with the desires of the sponsor. It could also be arranged that different groups of questions begin with varying amounts. For instance, easy questions with little money involved could be given to children.
Another sponsor’s angle would be in adding $1, $5, or $10 to the amount won by the participant in case he had with him the label of their product, their sales slip, or information concerning one of their advertised products.
The sponsor can also limit the amount of prizes by continuing the double-or-nothing feature only to the 5th, 6th, or 7th question. If a dollar is given with the first question, that will mean that the loss on five consecutive answers would be $16.00.
7. Estimated Program Cost on a Dollar Basis: By rapid-fire methods, four questions could be given a min *58 ute. This would mean, 100 questions at the outside for a 30 minute program, allowing for announcements, etc. The following estimate is based on 158% questions, derived from theoretically having 100 participants.

Scale of possible losses for set of questions

First Second Third Fourth Fifth Sixth Seventh Eighth Ninth Tenth
.01 .02 .04 .08 .16 .32 .64 1.28 2.66 5.12
.05 .10 .20 .80 1.60 3.20 6.40 12.80 26.60
.10 .20 .40 .80 1.60 3.20 6.40 12.80 25.60 51.20
.20 .40 .80 3.20 6.40 12.80 25.60 51.20 102.40
.40 .80 1.60 3.20 6.40 12.80 25.60 51.20 102.40 204.80
.60 2.00 4.00 8.00 16.00 32.00 64.00 128.00 256.00
1.00 2.00 4.00 8.00 16.00 32.00 64.00 128.00 256.00 512.00
In the estimate, I have assumed that any given participant will get half of them right, a fifty-fifty chance provided he knew nothing at all. Weighted for knowledge, however, the participant will, on the average, be able to guess on one, know another, and miss a third. (This is borne out by educational tests in which the scoring method consists of counting double off for those questions that are missed.)
100 PARTICIPANTS
100 participants 25 will be wrong (and drop out) 75 will be right 37% will “freeze" (estimated, one-half of 75)- $37. 50
37% participants (remaining for 2d question) 9% will be wrong 28 will be right 14 will “freeze" at $2_ 28.00
14 participants remaining for 3d question 3% will' be wrong 10% will be right 5% will “freeze” at $4_ 21. 00
5% participants remaining for 4th question 1% will be wrong 4 will be right % will “freeze” at $8_ 16. 00
2 left 1 wrong 1 right 1 “freeze" at $16- 16. 00
0 left Total loss. $118. 50
*59 8. Interpretation of Above Table: It will be noted that the figures on the extreme right can also be used as percentages. That is, if one begins with less, or more, than a dollar, you would merely multiply the number freezing by the particular figure. Thirty-seven “freezing” multiplied by .50 would give you $18.75 instead of the $37.50 in the loss column.
9. Actual Estimated Cost: In a thirty minute program, it would be impossible to have 100 participante. A more accurate figure would be not more than 30, using not more than 120 questions. This would cut the cost of the program from $118.50 to less than half that amount. In fact, I doubt that more than 60 questions would be used, and more than 25 be able to participate. The average cost if the questions were made up by the staff, should not be more than $50.00 for prizes, plus sponsor’s products. If questions were solicited from the radio audience, at $1 a shot, there would be an additional cost of $60. Badio time, etc., have not been included.
10. Audience Interest: The increasing amounts of money with the chance of losing everything would have the interest of a glorified game of craps. Because of the true-false nature of the questions, everyone has a chance, whether he’s a walking encyclopedia or not. If the participants are not winning as much as the sponsor would like to see them win, the announcer can begin with a higher amount. By regulating the difficulty of the question given, the announcer can directly affect Erize money distributed and thus keep tilings within ounds.
The participant would lend interest because of his hesitation as to whether or not he will gamble on getting the next question right and getting double what he already has — or losing everything he has already won, It appeals to everyone’s gambling instinct, to the instinct of enjoying one’s self at the discomfiture of another, the desire of a surprise element, love of a conflict between the questions and the participants intellect, and vicarious participation in the intellectual battle — not to mention the ad lib humor of the announcers.
There is no evidence that plaintiff ever supplied to The Biow Company any other written description or explanation of the radio program.
7. In a short time The Biow Company sent plaintiff a contract covering his format or proposal for the radio program. The agreement was signed by him on February 8, *60 1940, and provided that in consideration of a payment of $75 by The Biow Company, plaintiff had assigned and conveyed to The Biow Company, its successors and assigns, all of his title and interest in “Double or Nothing” and in the radio program conceived and invented by plaintiff and set forth in the script enclosed with his letter of January 27, 1940 (finding 6). The contract further provided, as follows:
The undersigned hereby represents and warrants that no other person has any claim or right of any kind or nature in and to said radio program and name and that said name and radio program are the sole and exclusive invention of the undersigned.
The undersigned acknowledges and affirms that The Biow Company, Inc., has not made any promises or representations of any kind in consideration of the foregoing conveyance, other than the promise to pay and the payment of the said sum of $75.00. If The Biow Company, Incorporated, makes commercially successful use of said radio program in behalf of any of its clients, then and in that event, The Biow Company, Incorporated, has stated to the undersigned, to which the undersigned has agreed, that it will recognize a moral obligation, which is not and shall not be deemed to be legal or equitable, to pay to the undersigned such further consideration as The Biow Company, Incorporated, shall determine in its sole and uncontrolled discretion, and the undersigned acknowledges and affirms that The Biow Company, Incorporated, in its sole and uncontrolled discretion shall likewise determine whether or not the use of the program has been commercially successful. The undersigned agrees that he shall have no rights against The Biow Company, Incorporated, in connection with such moral obligation and that any further consideration that may be delivered to him by The Biow Company, Incorporated, shall be in the nature of a voluntary payment.
The undersigned hereby covenants and agrees to execute such other and further instruments in connection with the foregoing conveyance as The Biow Company, Incorporated, its successors or assigns, may require.
8. On April 9, 1940, The Biow Company wrote plaintiff in pertinent part as follows:
I am glad to report to you that we are more than making good. The program goes on the air over a lim *61 ited number of Columbia Broadcasting System stations beginning April 21st, for the Wahl Company, makers of Eversharp pens and pencils.
It gives me great pleasure to tell you that although we are under no legal obligation to pay you anything, we are going to send you our check for $25 each week the program is on the air, up to and inclusive of 26 broadcasts. At that time I think we will have fulfilled, and with a generous bonus, any moral obligation I may have made to you.
I do hope you will be listening to the program and get a big kick out of hearing your brain-child on the air. The name of the show has been changed to “Take it or Leave it”.
9. In 1940 a lawsuit was instituted by the American Broadcasting Company against the Wahl Company and The Biow Company.[4] The basis of the suit was an alleged similarity between a radio program being broadcast by the American Broadcasting Company and the radio program plaintiff had assigned and conveyed to The Biow Company and which was sponsored on the air by the Wahl Company.
After the suit was instituted, The Biow Company called upon plaintiff for proof that he had conceived and invented the idea for the program, since this evidence was deemed essential to a successful defense of the suit. As proof of the fact that he had originated the idea as early as July 1939, plaintiff on July 10, 1940, sent The Biow Company a copy of the letter which Frank Gaither of Eadio Station WGST in Atlanta, Georgia, had sent to Young and Eubican, Inc., of New York City on July 26, 1939, (finding 5). Plaintiff did not testify or render any other services in connection with the legal proceedings.
10. Plaintiff was not satisfied with the payments offered by The Biow Company in its letter of April 9, 1940. He protested the amount of the proposed payments and, as a consequence, The Biow Company sent plaintiff a letter on June 13, 1940, containing a proposed agreement to increase his compensation. The conditions and terms of this offer were acceptable to plaintiff, and he signed the letter with a statement that the arrangement was satisfactory to him. To *62 the extent that it is material here, the letter agreement read as follows:
The threatened suit against Eversharp, Inc. and ourselves by the American Broadcasting Company has been instituted, and we have been served with a complaint which asks for $240,000 damages and an injunction. We shall defend the action vigorously, and are confident that we shall be successful. I am sure you will appreciate your responsibility in the matter, and although we are undertaking the defense, we shall expect your fullest cooperation. During the course of it, our attorneys will be in touch with you, and undoubtedly you will be called upon to testify, but that can await action by our counsel.
As I promised you, I have endeavored to obtain additional compensation for you, and am now in a position to tell you about it.
First, The Biow Company, Inc. became the full legal and equitable owner of the program conceived by you pursuant to the agreement which you executed on February 8th, 1940.
Second, The Biow Company, Inc. fulfilled completely its moral obligation to you when it agreed to make additional payments as set forth in our letter of April 9th, which was the payment of $25.00 a week each week the program was on the air up to and inclusive of twenty-six broadcasts.
Third, notwithstanding that you have neither legal, equitable nor moral claim against The Biow Company, Inc., and entirely on a voluntary basis, we are willing to make the following additional payments to you which you and I both have correctly termed a “windfall”:
(a) $25.00 a week for each week the program is broadcast commercially over five stations or less. If the program is broadcast as a sustaining program, no matter on how many stations, you are to receive no compensation. If the program is broadcast commercially on five stations or less and at the same time is broadcast as a sustaining program on any number of stations, the payment to be received by you will be $25.00.
(b) $50.00 per week each week the program is broadcast commercially over more than five stations.
(c) The foregoing arrangements for payment based upon use of the program commercially are restricted to use by our client, Eversharp Inc. (The Wahl Company) and in the event Eversharp, Inc. ceases to sponsor *63 the program, The Biow Company, Inc., as owner of the program, is free to make such use of the program as it, in its sole and uncontrolled discretion deems best for its own interest, free from any obligation to you, legal, equitable, or moral. In order that you may not misunderstand, it is understood that when and if Eversharp Inc. ceases to sponsor the program, you are thereafter not entitled to any further payments, even though the program is sponsored by another sponsor or is broadcast as a sustaining program. However, if Eversharp Inc. should suspend broadcasts and at a later date should sponsor the program again, we would make the payments to you as long as Eversharp Inc. sponsors the program.
(d) The foregoing arrangements will be made retroactive beginning with the third broadcast which was on May 5th, and subject to the conditions of this letter, we will send you a check for $150.00, which will take you up through the broadcast of Sunday, June 9th.
(e) No additional payments are to be made irrespective of the number of broadcasts per week.
(f) All the foregoing is conditioned upon your fulfilling your responsibilities in assisting ps in every reasonable way to defend the present suit or any other suit that may be instituted.
I am sure that you are now ready to give The Biow Company, Inc., as well as myself, a full vote of confidence. As soon as you have signed and returned the copy of this letter enclosed, I shall see to it that your check goes forward immediately.
11. Subsequent to the execution of the agreement of June 13,1940, plaintiff read in Variety magazine that The Biow Company was negotiating with Columbia Motion Pictures for the sale of the motion picture rights. Within a short time thereafter, plaintiff wrote The Biow Company, inquiring why he had not been consulted regarding the prospective sale. He took the position that the only rights that he had sold were the rights in the radio program. After further negotiations between the parties, a final contract was prepared by The Biow Company and entered into by the parties on June 25,1942. It provided as follows :
*****
1. I confirm and ratify that on February 8, 1940, I transferred and assigned to The Biow Company In *64 corporated, its successors and assigns, all of my right, title and interest in and to the name, “Double or Nothing”, the radio program conceived and invented by me, and set forth in a script enclosed in a letter from me dated January 27, 1940, addressed to you, which radio program has been called by you, “Take It or Leave It”, and such assignment was intended to and did transfer and assign to The Biow Company Incorporated all rights of every kind, nature and description in and to said title and idea embodied in said radio program, including without limitation radio rights, television rights, motion picture rights, rights to publish and rights to use said idea and title by any other means or media.
2. I acknowledge payment in full by you of all amounts that have become due to me from you to the date hereof and I agree that you have no further obligation or liability of any kind or character to me, other than as set forth herein. I agree that I have no claims of any kind against Eversharp, Inc., or Columbia Pictures Corporation for any use that has been made of the idea embodied in the radio program called, “Take It or Leave It”.
3. You agree to make the following payments to me:
(a) $25.00 a week for each week the program is broadcast commercially over five stations or less. If the program is broadcast as a sustaining program, no matter on how many stations, I am to receive no compensation. If the program is broadcast commercially on five stations or less and at the same time is broadcast as a sustaining program on any number of stations, the payment to be received by me will be $25.00 a week;
(b) $50.00 a week for each week the program is broadcast commercially over more than five stations;
(c) No additional payments are to be made, irrespective of the number of broadcasts per week;
(d) The foregoing arrangements for payment based upon use of the program commercially shall not be limited to use by your client, Eversharp, Inc., but shall cover any other commercial sponsorship of the program by any other client;
(e) As owner of the program, you are free to make such use of the program and the idea embodied in such program, whether by radio or other media, as you in your sole and uncontrolled discretion deem best for your own interests, free from any obligation to make any payments to me; and, in your discretion, you may *65 permit others to use the program and the idea embodied in such program for the purposes of television, publications, games, etc., without requiring the persons making such use to make any payment to you therefor; provided, however, that only when and if the program is sponsored commercially and during such period, you are to make the payments hereinbefore provided.
4. I agree to assist in every reasonable way to defend any existing suits or other actions that may be instituted against you or your clients in connection with the use of said title and said radio program. I agree to execute such other and further instruments in connection with this agreement and the foregoing transfer and assignment as The Biow Company, Incorporated, its successors or assigns, may require.
5. You represent that you have received no payments from Columbia Pictures Corporation pursuant to the agreement between you and Columbia Pictures Corporation, dated September 12, 1940, which agreement
Erovided for the making of motion pictures by Colum-ia Pictures Corporation based on the “Take It or Leave It” program, other than the payment of $10.00 made to you at the time of the execution of said agreement. You agree that you will pay to me one-third of the payments, if any, hereafter received by you from Columbia Pictures Corporation pursuant to said agreement or in connection with the use by Columbia Pictures Corporation of the idea embodied in the radio program called, “Take It or Leave It.” You further agree that you will pay to me? one-third of the payments, if any, hereafter received by you from any person, firm or corporation, in connection with the licensing by you of the use of said program and the idea embodied in said program in connection with television, publications, games, etc.
12. Effective as of January 1, 1944, The Biow Company ■assigned all of its rights in connection with the name “Take It or Leave It” and related matters to Take It or Leave It, Inc., a New York corporation.
13. By letter dated May 8, 1944, The Biow Company, Incorporated, wrote plaintiff regarding said assignment as :f ollows :
You are quite correct that the assignment to Take It or Leave It, Inc. will in no way affect your rights *66 under the agreement with The Biow Company, Inc. Take It Or Leave It, Inc., is on notice of your contractual rights and The Biow Company, Inc., is not relieved from any of its liability to you under its agreement with you.
14 In the same letter dated May 8, 1944, with regard to the sale of motion picture rights, The Biow Company, Incorporated, wrote plaintiff further:
As we previously advised you, we have been in active negotiations with Twentieth Century for motion picture rights and have just received the return of the executed agreement which provides for the payment of $2,000 to William Morris Agency for commissions in obtaining the contract and the payment to us of $4,500 upon execution of the agreement, and $4,500 each year thereafter for the years 1945, 1946 and 1947. With the agreement, we received the first payment of $4,500. We are remitting to the Pulton National Bank for deposit to your account, as requested by you, one-third of $4,500 or the sum of $1,500. You will note that we have not charged your portion with expenses, which we have had in connection with this matter, because we do not know the exact amount of the expenses at this time.
As his share of the proceeds of the sale of the motion picture rights, plaintiff received $1,500 for each of the years 1944 through 1947, which amounts represented one-third of the payments received by The Biow Company from Twentieth Century-Fox Co. During the same period, plaintiff also received approximately $2,600 per year from The Biow Company because of the radio broadcast “Take It or Leave It”.
15. As of March 4,1955, the corporation, Take It or Leave It, Inc. entered into a license agreement with Louis G. Cowan, Inc., 575 Madison Avenue, New York City, under which the licensee Louis G. Cowan, Inc. was given the sole and exclusive right to produce a television program based upon the idea and title “Take It or Leave It”. Under this license agreement, Take It or Leave It, Inc. was to receive 50 percent of the net profits made by the licensee, Louis G. Cowan, Inc. The licensee, under the agreement *67 was to pay Take It or Leave It, Inc., as an advance against such profit division, the amount of $750 per week for each week in which at least one originating nighttime television program took place.
16. Pursuant to the March 4, 1955, “license” agreement, Louis G. Cowan, Inc., produced a television program entitled “The $64,000 Question”. This television production commenced during June 1955, and for the period June 1, 1955, through December 31, 1955, Louis G. Cowan, Inc., paid to Take It or Leave It, Inc. an aggregate advance of $22,500. Of such $22,500 advance, plaintiff was paid in the calendar year 1955, under his agreement with The Biow Company, dated June 25, 1942, one third, or the sum of $7,500. The remaining portions of the net profit due plaintiff under the June 25, 1942, agreement for the calendar year 1955 were paid to him in the calendar year 1956.
17. Neither the plaintiff nor any member of his family has ever owned any interest in or received any salary from The Biow Company, Take It or Leave It, Inc., or Louis G. Cowan, Inc. Except as stated in finding 9, neither plaintiff nor any member of his family has been called upon to perform or has performed any personal service for either The Biow Company, Take It or Leave It, Inc., or Louis G. Cowan, Inc.
18. On April 17,1956, plaintiffs duly filed a joint Federal income tax return for the year 1955, with the District Director of Internal Bevenue, Atlanta, Georgia, and on that date paid the amount of $1,325.85. On July 23,1956, plaintiffs filed an amended Federal income tax return for the year 1955, with the District Director of Internal Revenue, Atlanta, Georgia, and on that date, paid taxes in the amount of $1,961 plus interest of $31.07.
19. On August 23, 1957, plaintiffs duly filed with the District Director of Internal Revenue, Atlanta, Georgia, in proper form, a claim for refund in the amount of $1,076.61. The stated reason therefor was that the $7,500 received by the plaintiff, Peter G. Cranford, during the year 1955 from Take It or Leave It, Inc. were receipts from the sale of a *68 capital asset, and income tax should have been paid for the year 1955 on that basis.
20. On July 22,1960, when the petition in these proceedings was filed, the Commissioner of Internal Bevenue had taken no action on the claim for refund, but on August 9, 1960, the District Director of Internal Bevenue, Atlanta, Georgia, duly sent to plaintiffs a notice of disallowance of their claim for refund for the calendar year 1955.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover and their petition is dismissed.

 Although this suit is brought jointly by husband and wife, we shall use the term “plaintiff” to refer to Peter G. Cranford since the controversy pertains to his activities.

 During oral argument, the Government cited another case, Bowen v. Yankee Network, 46 F. Supp. 62, 63 (D.C. Mass. 1942), ior the proposition that a plan for a radio program was merely an idea in whieh there was no property right. However, the Bowen case was concerned with wrongful appropriation of an idea under common-law property doctrine, and it was not concerned with the tax status of the proceeds from the sale of such an idea.

 96 Cong. Ree. 15594, 15599 (1950).

 The decisions are reported in 36 F. Supp. 167 and 121 F. 2d 412.