Sylvester Hillary Williams and Sylvia Mae Williams v. Commissioner.
Williams v. Commissioner
Docket No. 2190-67.
United States Tax Court
T.C. Memo 1970-292; 1970 Tax Ct. Memo LEXIS 68; 29 T.C.M. (CCH) 1347; T.C.M. (RIA) 70292; October 14, 1970, Filed *68 The petitioners failed to provide the Court with sufficient evidence to support their position on the issues presented. Held, 1. The petitioners may not deduct $2,287 in the year 1961 under section 165 of the 1954 Code as a loss incident to a forfeiture; 2. The petitioners may not deduct $201 in the year 1962 under section 165 of the 1954 Code as a loss incurred in the sale of a water heater and a washer-dryer; 3. The petitioners may not deduct $986 in each of the years 1961 and 1962 under various sections of the 1954 Code in connection with certain expendituress made in 1960 to promote an idea for a motion picture; 4. The petitioners may not deduct $500 and $144 in the years 1961 and 1962, respectively, as losses from bad debts under section 166 of the 1954 Code; 5. The petitioners are not entitled to dependency exemptions in either 1961 or 1962 for the petitioner-husband's two children under section 151 of the 1954 Code; and 6. The petitioners' gross income in the year 1962 was properly increased by respondent in the amount of $238.50 under section 61 of the 1954 Code. Sylvester Hillary Williams, pro se, 214 Tenafly Rd., Tenafly, N. J. Richard J. Mandell and Michael A. Menillo, *69 for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: The respondent determined deficiencies in the petitioners' income taxes for the calendar years 1961 and 1962 in the amounts of $698 and $694.45, respectively. The issues remaining in the case for our decision are as follows: (1) Whether the petitioners may deduct $2,287 in the year 1961 under section 165 of the 1954 Code as a loss incident to a forfeiture. (2) Whether the petitioners may deduct $201 in the year 1962 under section 165 of the 1954 Code as a loss incurred in the sale of a water heater and a washer-dryer. (3) Whether the petitioners may deduct $986 in each of the years 1961 and 1962 under various sections of the 1954 Code in connection with certain expenditures made in 1960 to promote an idea for a motion picture. (4) Whether the petitioners may deduct $500 and $144 in the years 1961 and 1962, respectively, as losses from bad debts under section 166 of the 1954 Code. (5) Whether the petitioners are entitled to two dependency exemptions in each of the years 1961 and 1962 for the petitioner-husband's two children under section 151 of the 1954 Code. (6) Whether the petitioners' gross income in *70 the year 1962 should be increased by the amount of $238.50 under section 61 of the 1954 Code. Findings of Fact Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. At the time the petition herein was filed, the petitioners, Sylvester Hillary Williams (hereinafter referred to as Hillary) and Sylvia Mae Williams (hereinafter referred to as Sylvia), husband and wife, resided at 214 Tenafly Road, Tenafly, Bergen County, New Jersey. Hillary and Sylvia executed joint income tax returns for the taxable years 1961 and 1962 and caused the returns to be timely filed with the district director of internal revenue, Manhattan District, New York. 1348 On the returns for the years in issue, Hillary described himself as "an attorney and engineer by training, an executive by experience and a consulting management engineer by profession." Hillary engaged in his consulting activities under his own name or under the business names: "Williams, Howlett & Broad" and "The Murray Hill Group. " Issue 1: The Archer Court Dwelling In January, 1959, Hillary and his then wife, Joyce R. Williams *71 (hereinafter referred to as Joyce), entered into a contract to purchase a one-family dwelling located at 1 Archer Court, Davenport, Iowa, from Ruth C. Archer and Gaylord L. Archer, husband and wife. Hillary wanted to purchase this property in order to live a short distance (approximately five miles) from Rock Island, Illinois, where he served as an engineering consultant to the Herman Nelson Division of the American Air Filter Co. He expected to remain employed by this company for more than two years. The purchase price of the property under the contract was $25,000. This amount was to be paid with $16,500 borrowed from the Northwestern Mutual Life Insurance Co. This loan was to be secured by a mortgage on the property. Hillary and Joyce agreed to pay the remaining $8,500 in periodic installments. In a warranty deed, dated February 16, 1959, the Archers conveyed the Archer Court dwelling to Hillary in fee simple. The deed was recorded in the Scott County (Iowa) records on February 17, 1959. Hillary subsequently obtained a loan from Northwestern Mutual Life Insurance Co. which was secured by a mortgage on the property. Pursuant to the January, 1959, contract, Hillary reconveyed the *72 property to the Archers (subject to the mortgage held by Northwestern Mutual) as security for the payment of the $8,500 which remained due. The Archers agreed not to record the January, 1959, contract or the deed of reconveyance, provided that Hillary and Joyce would not be in default on any of the required installment payments. In the event of such a default, it was understood by the parties that Hillary and Joyce would forfeit all amounts paid under the contract, after appropriate notice. The petitioners moved into the Archer Court dwelling in March of 1959. [1] *73 For most of 1959, although they traveled at times, the house served as the petitioners' main residence. Hillary's parents came to visit and stayed at the house. Sylvia's mother resided there for a period of time. Hillary kept file cabinets at the house and made some use of the dwelling as an "office" in his engineering consulting practice. Periodically, Hillary would hold meetings at the house with business associates. These guests would occasionally stay overnight. However, during almost the entire year 1959, Hillary was a full-time employee of American Air Filter Company at Rock Island. On September 11, 1959, Hillary and Ruth C. Archer executed a contract wherein Ruth C. Archer, as a real estate broker, agreed to attempt to find a purchaser of the Archer Court property and complete a sale thereof. In this agreement, Hillary was designated as the "owner" of the property. Ruth C. Archer found no buyer for Hillary. Hillary encountered financial difficulty, and by September of 1959, after having paid $3,699.85, he was unable to make additional payments to the Archers. On December 4, 1959, the Archers filed the January, 1959, contract in the Scott County records and they published a "notice of forfeiture," advising Hillary and Joyce that, unless they complied with the provisions of the contract within 30 days, they [the Archers] would file a declaration of forfeiture. Hillary and Joyce made no further payments. The petitioners moved out of the Archer Court dwelling by the end of 1959 and established a residence in New Jersey. After January 1, 1960, Hillary made no additional *74 payments on his mortgage loan with Northwestern Mutual Life Insurance Co. On January 22, 1960, Hillary executed a contract with a real estate broker named Hancock, wherein Hancock agreed to attempt to find a purchaser for the Archer Court property and complete a sale thereof. In this agreement, Hillary was regarded as the "owner" of the property. Hancock found no buyer for Hillary. At some time in January, 1960, the Archers filed Hillary's deed of reconveyance and a declaration of forfeiture in the records of Scott County. 1349 On February 1, 1960, Hillary and Joyce filed suit in the Scott County district court to set aside the forfeiture under the January, 1959 contract. After that date, they took no action to pursue the litigation. In a letter, dated June 3, 1960, Northwestern Mutual Life Insurance Co. advised Hillary that, because he had made no payments on his loan since January 1, 1960, the company had referred the matter to its attorneys with instructions to foreclose on the mortgage. Ultimately, the company foreclosed, although the precise time of such foreclosure is not apparent from the record. The suit filed by Hillary and Joyce in the district court was defended by one *75 Harold Groth, who had acquired the Archer's interest in the Archer Court property. Groth filed a petition of intervention with the district court on October 19, 1960, in which he asked that the petition to set aside the forfeiture be dismissed because Hillary and Joyce had made no further payments for the property under the contract. Hillary and Joyce did not respond to Groth's petition and on November 17, 1960, Groth filed a motion for summary judgment. Hillary and Joyce did not respond to this motion. In a decree, dated December 1, 1960 the Scott County district court upheld the forfeiture by granting Groth's motion and dismissing the petition filed by Hillary and Joyce. The judge observed in his decree that Hillary and Joyce had "raised no issue which may be submitted to the court * * *." The decree was final, and no attempt was made to appeal it or otherwise modify it. On their income tax return for the year 1961, the petitioners reported a long-term capital loss with the explanation "bought land contract, paid total $4,575 all lost" and deducted $2,287 as a loss arising from the forfeiture. The respondent's deficiency notice to the petitioners, dated March 31, 1967, disallowed *76 this loss because the cost basis of the property had not been substantiated and because it had not been established that the property was used in a trade or business or held for the production of income. An additional question, discussed by both parties at the trial and on brief, concerns the year in which the claimed loss occurred. Issue 2: The Water Heater and Washer-Dryer In 1962, the petitioners sold a water heater and a combination washing machine and clothes dryer. On their income tax return for the year 1962, the petitioners claimed $201 as a loss on the sale of these appliances, stating that they had been acquired in November of 1961 at a cost of $224 and sold in December of 1962 for $3 and that depreciation allowed or allowable since acquisition was $20. The respondent's statutory notice to the petitioners, dated March 31, 1967, disallowed this deduction on the grounds that (1) the cost and sales price of the appliances had not been substantiated, and (2) it had not been established that the articles had been used in a trade or business or held for the production of income. Issue 3: "Rendezvous Rednose" In 1960, Hillary sought to promote a project known as "Rendezvous Rednose." *77 Hillary's promotional activities were conducted under his own name and under the name of "The Murray Hill Group." The purpose of the project was, for the most part, to obtain financial backing for and produce a motion picture about a group of fighter pilots during World War II. On May 1, 1960, Hillary executed a contract with Theodore J. Flicker, a producer, director, and writer, wherein Flicker agreed to aid groups and entities promoted by Hillary and to apply his talents in the development of productions, including "Rendezvous Rednose," and Hillary agreed to promote and organize entities and obtain financing therefor which would develop and produce scripts and other entertainment and commercial properties for theater, stage, radio, television and motion pictures. Hillary agreed to pay Flicker $1,500 a month pending formation of the groups or entities. Consistent with this agreement but prior to its execution, Hillary paid Flicker $1,500 on April 1, 1960, while the contract was in negotiation. Hillary paid Flicker an additional $500 on May 2, 1960. Hillary made no further payments to Flicker, and in October, 1960, Hillary was advised that Flicker was discontinuing his services under *78 the contract. Hillary's promotional efforts continued through 1961 and 1962, and, under a "gentlemen's agreement," he continued to consult with Flicker. As a result of his efforts to advance the "Rendezvous Rednose" project in 1961 and 1962, Hillary incurred additional expenses. Eventually, Flicker's other commitments prevented him from being of further assistance to Hillary. Because he felt that Flicker's services were essential to the development of "Rendezvous Rednose," Hillary ultimately abandoned 1350 the project. "Rendezvous Rednose" never advanced past the idea stage, and no book, play, script, scenario, or motion picture was ever developed or produced. The petitioners attached a schedule to their income tax return for the year 1961 on which they enumerated expenditures allegedly made during 1960 in connection with "Rendezvous Rednose." The schedule lists the $2,000 paid to Flicker and alleges additional 1960 expenses of $959.40. Of the total amount ($2,959.40), the petitioners deducted $986 in 1961 as a "loss." The schedule indicates that a like amount had been deducted in 1960. The petitioners attached a copy of the same schedule to their 1962 income tax return and deducted *79 $986 as a "loss" in that year as well. The respondent's statutory notice to the petitioners, dated March 31, 1967, disallowed these deductions for the years in issue because the petitioners had not established that the expenses were incurred in 1961 or 1962 or that they were incurred in a trade or business. Issue 4: Hillary's Loans to Nelson Prior to the years in issue, Hillary lent some money to one Charles Dempsey Nelson, Jr. Nelson did not make full repayment of these loans. On May 21, 1953, Hillary paid $250 by check to Apex Building Maintenance, an organization in which Hillary had been a partner, which was described as an emergency loan. On June 10, 1955, in connection with an undisclosed cause of action, Hillary obtained a judgment against Nelson in the amount of $478.47. In partial satisfaction of this judgment, Nelson paid Hillary's attorney $75 on June 10, 1955, and $25 on August 22, 1955. The balance remaining to be paid on the judgment as of August 22, 1955, was $378.47. On May 5, 1960, Hillary wrote Nelson demanding payment of $3,000. Hillary did not state to whom or for what reason the $3,000 was to be paid. Nelson and his son visited Hillary and Sylvia in Tenafly, New *80 Jersey in approximately 1962 or 1963. Subsequently, Nelson disappeared; at least petitioners did not know where to find him. In their income tax return for the year 1961, the petitioners deducted $500 as "uncollectable bad debt." In their income tax return for the year 1962, the petitioners deducted $144 as an "uncollected bad debt." This latter amount was not in reference to any loan made to Nelson. The respondent's statutory notice to the petitioners, dated March 31, 1967, disallowed these deductions for lack of substantiation. Issue 5: The Dependency Exemptions Hillary married Joyce in November of 1945. Two children were born of the marriage - Richard and Leigh. During the years in issue, Richard was approximately 11-12 years old and Leigh was approximately 9-10 years old. On May 11, 1959, the Superior Court of Cook County, Illinois, issued a decree granting Joyce a divorce from Hillary. The decree gave Joyce the custody of the two children and ordered Hillary to make payments for their support. Under the supervision of the Bergen County, New Jersey, Probation Department, Hillary paid for the suport of Richard and Leigh the sum of $1,373 in 1961 and the sum of $1,380 in 1962. Throughout *81 the years 1961 and 1962, Richard and Leigh lived with their mother in Birmingham, Michigan. The house in which they lived contained three bedrooms - two on the second floor and one on the basement level. On the first floor were located the living room, the kitchen, and the bathroom. Richard and Leigh each had one bedroom, and Joyce occupied the third. The house was situated in an "expensive" community. Occasionally during this period, the children visited and stayed at the home of their maternal grandmother in Port Huron, Michigan. Hillary's father, Sylvester V. Williams, and his mother, Helen Williams, visited with the children in 1961 and 1962 for very brief periods of time. While on these visits, and at other times throughout the years at issue, Hillary's parents expended various amounts for the benefit of Richard and Leigh. They paid for medical and dental expenses, articles of clothing, shoes, eyeglasses, class trips, and miscellaneous items needed for the children's schooling. They also gave Hillary money to send to the children. In addition, Hillary's parents paid for some of the children's meals during the brief intervals when they were with them. In 1961 and 1962, Sylvester *82 V. 1351 Williams and Helen Williams agreed to spend or spent a total of approximately $1,000 for the support of Richard and Leigh. They also loaned considerable amounts of money to Hillary over the years 1959-1967. Hillary's parents kept very careful records of the money they gave to and spent on behalf of Richard and Leigh. It was their intention to give equal amounts to each of their seven grandchildren, and accounts were kept to assure that there would be no favoritism. All of Hillary's parents' expenditures, including amounts loaned to Hillary, were charged to an account they kept in his name. They never were repaid and subsequently wrote off some or all of the obligations as uncollectible. During 1961 and 1962, Hillary never visited with his children at their home in Birmingham, Michigan. On one occasion, he met with Richard for several hours. At no time during those years did the children live in petitioners' home. In their income tax returns for the years 1961 and 1962, the petitioners claimed dependency exemptions for Richard and Leigh, stating that the children lived with them 12 months of each year and that they furnished "all" support. The respondent's statutory notice *83 to the petitioners, dated March 31, 1967, disallowed these exemptions because it had not been shown that the petitioners had contributed more than one-half of the children's support during those years. Issue 6: Hillary's Unreported Income In 1962, Hillary was hired by McCormick & Co. as a consultant. During the year Hillary was paid $1,265 by the company for his services. On their income tax return for the year 1962, the petitioners reported only $900 of this amount. The respondent's statutory notice to the petitioners, dated March 31, 1967, stated that they understated Hillary's 1962 income from McCormick & Co. The statutory notice allowed $126.50 of the $365 discrepancy to be deducted as an employment agency fee and included the remaining $238.50 in the petitioners' income. Opinion The petitioners have presented six issues for our decision, having conceded one other issue. Most of the evidence they have offered to support their contentions is confused, conflicting and weak, and consists almost entirely of unsubstantiated self-serving declarations. Although Hillary is a lawyer, the petitioners were not represented by other counsel. The respondent's determinations are prima facie *84 correct, and the inadequacies in the petitioners' evidence must of necessity work to their detriment. They have the burden of proving error in the respondent's statutory notice. Welch v. Helvering, 290 U.S. 111 (1933); Rule 32 of the Rules of Practice of this Court. Issue 1: The Archer Court Dwelling In January 1959, Hillary and his former wife, Joyce, entered into a contract with the Archers to purchase a one-family dwelling at 1 Archer Court in Davenport, Iowa. Hillary and Joyce made some payments under the contract, but, upon their default, they forfeited these amounts. On their 1961 income tax return, the petitioners deducted $2,287 [2] as a loss arising from the forfeiture. [3] To be deductible, the petitioners' loss must fall within the scope of section 165. [4]Subsection *85 (a) of section 165 provides that "there shall be allowed as a deduction any loss sustained during the taxable year * * *." Subsection (c) of section 165 permits an individual taxpayer to deduct a loss only in specified instances. [5] The petitioners contend only that their loss was "incurred in a trade or business" and thereby qualifies for a deduction under subsection (c). The respondent argues on brief that the petitioners are not entitled to a deduction under section 165 because the loss was not shown to have been "incurred in a trade or business" and because the loss was sustained in 1960 and not in 1961. We find merit in the respondent's position. Hillary suffered a loss in connection with his attempt to acquire the Archer Court dwelling. In order to qualify for a loss deduction, the petitioners have to show 1352 a business purpose for the house. If the house was only partly used for business reasons, then the petitioners have to *86 establish the proportion of business use with some degree of specificity in order to deduct a corresponding proportion of the loss. See Rev. Rul. 286, 1953-2 C.B. 20. Cf. Sharp v. United States, 199 F. Supp. 743 (D.C. Del. 1961), affd. per curiam 303 F. 2d 783 (C.A. 3, 1962). The record does not disclose with any certainty the extent to which Hillary used the dwelling in his engineering consulting practice. The record does show that it served as the main residence of the petitioners and that Hillary's principal purpose in acquiring the house was to have a home near his place of employment. The petitioners lived there for at least several months. They invited their parents to visit them there and, in the case of Sylvia's mother, to reside with them. Although it may be true that Hillary occasionally had a business meeting in the house, or that business associates and friends visited there, the petitioners have failed to establish that the business use of the house was anything more than minimal. In the absence of any evidence from which we can reliably determine the proportions of business and personal use, we are unable to hold that the petitioners are entitled to a loss deduction. *87 In any event, it is apparent that the petitioners would not be entitled to their claimed deduction in the year in which they seek to take it. The record establishes that if Hillary in fact suffered a deductible loss at all, he did so in 1960, a year not presently before the Court. Our findings show that Hillary and Sylvia left the Archer Court dwelling in 1959 and moved to New Jersey. Hillary had stopped making payments under his contract with the Archers, and shortly after leaving Davenport, he discontinued payments to Northwestern Mutual to apply against his mortgage loan with that company. Hillary's attempts to find a buyer for the property in 1959 and in January, 1960, were to no avail. On December 4, 1959, after vain efforts to avoid legal action, the Archers gave Hillary 30 days to make up his deficiencies under the January, 1959 contract and there-by avoid a forfeiture of what he had paid. Hillary made no further payments. As a result, it seems fairly clear that when the Archers filed the declaration of forfeiture and the deed of reconveyance in the county records in January, 1960, Hillary's loss was a fait accompli. Sections 656.1 through 656.6, Iowa Code Annotated. Cf. Collateral Mortgage & Investment C., 37 B.T.A. 630, 633-634 (1938). *88 Nothing in the record indicates that Hillary honestly believed he could recover any amounts from the Archers; his conduct convinces us he believed he could not. We note that he did file a petition in a local court to set aside the forfeiture, but as our findings indicate, the record establishes to our satisfaction that the institution of this litigation was a futile and fruitless gesture and that Hillary realized that he had no basis for such an action. [6] He never took any steps to carry the suit forward; he did not respond to the petition filed by Harold Groth on October 19, 1960; he did not respond to Groth's motion for summary judgment filed on November 17, 1960; and he made no attempt to appeal or otherwise modify the decree. We have concluded that after January, 1960, Hillary came to the realization that he no longer had any interest in the Archer Court dwelling or any claim to the money he had paid to the Archers. In view of the fact that Hillary and his wife had left the state, that he never attempted *89 to continue payments under the January, 1959 contract, that he stopped making payments to Northwestern Mutual, and that he failed to take any action after February 1, 1960, to support his petition to set aside the forfeiture or take any other steps to protect any interest he amy have had, we believe that (1) there was no reasonable prospect that Hillary would recover the amounts he had forfeited ( section 1.165-1(d)(2)(ii), Income Tax Regs.), and (2) Hillary effectively abandoned any rights or claims in connection with the house in the early part of 1960 ( section 1.165-1(d)(2)(i), Income Tax Regs.). In light of these considerations, we are unable to accept the petitioners' argument that Hillary suffered the loss in question in 1961. The record does not support the petitioners' claimed deduction in 1961 of $2,287, and the respondent was correct in disallowing it. 1353 Issue 2: The Water Heater and Washer-Dryer On their income tax return for the calendar year 1962, the petitioners claimed a loss in the amount of $201 on the sale of a water heater and a combination washing machine and clothes dryer. As we observed above, section 165(a) allows "as a deduction any loss sustained during *90 the taxable year * * *" and section 165(c) limits the deduction for individual taxpayers to "losses incurred in a trade or business," "losses incurred in any transaction entered into for profit," and casualty losses. The petitioners have not established that their claimed loss fits within any of the permissible categories listed in section 165(c). They allege that the appliances were used by Hillary for business purposes. At the trial, however, Sylvia testified with reference to the washer-dryer, that Hillary "did not need it for the office but I needed it." In addition, no evidence was introduced to substantiate the statements in the 1962 return as to the basis of the appliances or their selling price. The petitioners have not shown that they are entitled to this loss deduction, and we hold that it was properly denied. Section 1.165-1, Income Tax Regs. Issue 3: "Rendezvous" In 1960, Hillary sought to promote the production of a motion picture film about a group of heroic fighter pilots. He incurred expenses in that year in connection with his unsuccessful efforts to promote the project ("Rendezvous Rednose"). On their income tax returns for each of the years 1961 and 1962, the *91 petitioners deducted as a "loss" a portion of Hillary's 1960 expenditures (which they allege to be in the total amount of $2,959.40). The respondent argues, inter alia, that since the expenses were admittedly incurred in 1960, they were properly deductible only in that year, if at all. The petitioners have cited no sections of the Code and have referred us to no cases which support these deductions. On their returns for the years in issue, the petitioners list the amounts expended in 1960 as a "loss." However, regardless of whether these amounts are referred to as losses or expenses, we do not see how they give rise to deductions in later taxable years. Section 162 ("Trade or Business Expenses"), section 165 ("Losses"), and section 212 ("Expenses for Production of Income") have reference to losses sustained andexpenses paid or incurred "during the taxable year." Therefore, even if Hillary's expenditures fall within the purview of these Code sections, the petitioners are unable to benefit in this case since we do not have the year 1960 before us. [7] *92 On brief, the petitioners refer to "Rendezvous Rednose" as "property" and state that since they knew "said property would be under development over a period of time," they "accordingly amortized the investment" over a three-year period. [8] *93 We assume from this statement that the petitioners wish to secure the benefits of section 167; we are aware of no other section of the Code which would even remotely suggest this tax treatment on the facts presently before us. Cf. Keith Misegades, 53 T.C. 477, 484 (1969). Section 167 allows "as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear * * * of property used in the trade or business or * * * of property held for the production of income." To qualify for this deduction, it is clear that a taxpayer must first show that he is holding the requisite "property." See United States v. Georgia Railroad and Banking Co., 348 F. 2d 278, 287 (C.A. 5, 1965). The petitioners have not established that "Rendezvous Rednose" was anything more than an idea or a concept. It was a promotional project that really never got off the ground. The evidence indicates that Hillary was never able to develop his idea; no motion picture or motion picture script was ever produced, and no book or play was ever written. It is therefore highly 1354 doubtful that Hillary's efforts produced "property" of any nature. Cf. Harold L. Regenstein, 35 T.C. 183, 190 (1960); Stern v. United States, 164 F. Supp. 847, 852 (E. D. La. 1958), affd. pur curiam 262 F. 2d 957 (C.A. 5, 1959), *94 certiorari denied 359 U.S. 969 (1959); Bowen v. Yankee Network, 46 F. Supp. 62, 63 (D. C. Mass. 1942). However, even if the petitioners had been able to convince us that some "property" in fact existed, they have failed to make any showing as to its useful life. We are unable to hold that they are entitled to the claimed deductions as amortization or depreciation. See sections 1.167 (a)-1 and 1.167(a)-3, Income Tax Regs.
We conclude that the respondent correctly disallowed the deduction in 1961 and 1962 of Hillary's 1960 expenditures for the Rednose promotional idea. Issue 4: Hillary's Loans to Nelson Section 166 allows "as a deduction any debt which becomes worthless within the taxable year." The section provides different rules for the deduction of business and nonbusiness debts. To establish a right to a deduction under this section, the petitioners must show that a loan was made and a genuine debt existed and that some identifiable event or circumstance occurred in the taxable year to render the debt worthless during, and prior to the end of the year. Griffin Andrew, 54 T.C. 239, 244-245 (1970); I. Hal Millsap, Jr., 46 T.C. 751, 762 (1966), affd. 387 F. 2d 420 (C.A. 8, 1968). *95 The petitioners deducted $500 as a bad debt on their 1961 return and $144 as a bad debt on their 1962 return. On brief the petitioners assert that the $500 figure reflected a loan to Dempsey Nelson, Jr., which became uncollectible when Nelson disappeared. No mention is made of the $144 deduction in 1962. The record does not reliably disclose when the alleged loans to Nelson were made, what the total amounts of these loans were, what the purpose of these loans was, or to what extent the loans were repaid. The unsupported testimony offered in connection with this issue was incomplete and unconvincing. The petitioners have attempted to establish the existence of the debts by placing in evidence a check drawn by Hillary in 1953 in the amount of $250 and made payable to Apex Building Maintenance, an organization in which Hillary was a partner. We are at a loss to see how that check proves that Nelson owed Hillary $500. The fact that Hillary obtained a judgment against Neslon in 1955 for $478.47 and the fact that Hillary wrote Nelson in 1960 requesting payment of $3,000 for some unspecified purpose, do not add support to the petitioners' contentions. These facts merely add confusion to a *96 record in which no additional confusion is necessary. While it may be possible to show the worthlessness of a debt by establishing that during the taxable year the debtor disappeared and that none of his property could be located - see, e.g. Nathan H. Gordon Corporation, ; T.C. 571, 584 (1943), appeal dismissed (C.A. 1, 1944) - we have found that Nelson did not disappear until after the years in issue. Even if he had disappeared in 1961 as the petitioners allege, we have no evidence of what property Nelson left behind or of what attempts the petitioners made to collect any of the money owed them. There is absolutely nothing in the record relating to the claimed deduction of $144 in 1962. On the record presented, we must conclude that the respondent properly denied the bad debt deductions in question. Issue 5: The Dependency Exemptions In 1959, Hillary and Joyce Williams were divorced and Joyce was granted custody of their two children - Richard and Leigh. In 1961 and 1962, Joyce and the children resided in Birmingham, Michigan. Through the Bergen County, New Jersey Probation Department, Hillary made support payments to the children of $1,373 in 1961 and $1,380 in 1962. The petitioners *97 claimed Richard and Leigh as dependents on their returns for both of those years stating that the children lived in their home with them during all 12 months of each year and that they furnished 100 percent of their support. This was as far from the truth as possible. Section 151(e) permits an exemption of $600 during the years in issue for each of a taxpayer's dependents. The term "dependent" is defined in section 152(a) to include certain individuals "over half of whose support, for the calendar year in which the taxable year of the taxpayer begins, was 1355 received from the taxpayer." [9]Section 152 (a)(1) includes "[a] son or daughter of the taxpayer" among the individuals who can qualify for "dependent" status. The respondent determined that it had not been shown that Hillary's payments comprised more than one-half of the children's total support. We agree with the respondent's determination. Pursuant to sections 151(e) and 152(a), the petitioners have the *98 burden of proving that they provided more than one-half of the support of each of the two children. Rose D. Seraydar, 50 T.C. 756, 760-61 (1968); James E. Stafford, 46 T.C. 515, 517-518 (1966). The petitioners have shown that they made support payments of $1,373 in 1961 and $1,380 in 1962, [10] and that the senior Williamses also contributed additional amounts. We cannot accept the unsubstantiated estimates of Hillary's parents that they spent approximately $1,000 for the children's support in each of the years before us. No canceled checks, receipts or other evidences of payment were presented and most of the inexpensive items of clothing mentioned, given to the children on only a few occasions in two years time, would not begin to account for the suggested totals. It was by no means clear that a large dental expense which the senior Williamses agreed to pay for one of the children was incurred or paid in either year. [11] *99 It therefore cannot be considered as furnished or provided in 1961 or 1962. Even if we were to add an additional sum to the amounts provided by Hillary and conclude that although it was furnished by his parents it should be counted as part of his contribution to his children's support, Hillary cannot prevail on this issue. To prove his own contribution is not enough; he must prove that that amount exceeded one-half of total support. Robert I. Brown, 48 T.C. 42 (1967). We recognize that the precise or exact amount need not be established. Theodore Milgroom, 31 T.C. 1256 (1959), but we cannot even infer or approximate from the evidence before us as to an outside amount contributed by all concerned to support these children in the years involved. The record is void of competent evidence to show how much Joyce or her mother contributed to the support of *100 Richard and Leigh. None of the witnesses who testified on this question were with the children for more than very brief periods, and none of the witnesses offered testimony as to Joyce's financial means or ability to support her children. None of them had any direct knowledge of the expenses for housing, clothing, meals, utilities, or other necessities provided by Joyce. Also, as our findings reflect, the children occasionally stayed with their maternal grandmother. We are not aware of her financial situation or resources and could only speculate as to the extent of her contribution to her grandchildren's support. The petitioners have not provided us with evidence as to even an approximate amount of the total spent for the support of Richard and Leigh in 1961 or 1962 or with evidence from which that amount may be reasonably determined. As a result, they have failed to satisfy their burden of proof. See James E. Stafford, supra at page 518 and James H. Fitzner, 31 T.C. 1252, 1255 (1959). We must conclude and hold that the petitioners have failed to carry their burden of proving that they are entitled to the contested dependency exemptions in either year. James E. Stafford, supra; Bernard C. Rivers, 33 T.C. 935 (1960). *101 Issue 6: Hillary's Unreported Income In 1962, Hillary was employed by McCormick & Co. and was paid $1,265 by the company for his services in that year. The petitioners do not dispute that Hillary received this total amount, but they allege that Hillary was in fact paid only $1,020.18 by McCormick & Co. in 1962. They claim that they reported this amount on their 1962 return and that the balance ($244.82) was paid to Hillary in 1963. These allegations are unsupported by any documentary proof whatever and conflict with (1) the information return (Form 1099) filed by McCormick & Co. for 1962, stating that Hillary 1356 was paid $1,265 in that year, and (2) the statutory notice of deficiency which determined that the petitioners reported only $900 [12] of the money paid by McCormick & Co. on their 1962 return and that $1,265 was received. The meager, confused and unsatisfactory evidence presented by the petitioners on this question is not sufficiently credible or trustworthy to rebut the presumption of correctness attaching to the respondent's determination. Petitioners presented nothing from McCormick & Co. and made no showing of any effort made to obtain substantiating evidence of any sort *102 to establish that less than $1,265 was in fact paid to Hillary in 1962 by McCormick as reported by that Company on its Form 1099. We conclude that the petitioners understated their 1962 income by the net amount of $238.50 as determined by respondent. [13] Conclusion The petitioners have conceded that disallowed automobile depreciation deductions of $540 for each of the years 1961 and 1962 are not allowable. Accordingly, Decision will be entered for the respondent. Footnotes
1. Sylvia testified that she married Hillary on March 19, 1959. Other evidence in the case establishes that Hillary was not divorced from Joyce until May 11, 1959. Unfortunately, we have found nothing in the record to resolve this confusion.
2. Our findings indicate that $3,699.85 was forfeited. The petitioners arrived at a deduction of $2,287 by claiming a long-term capital loss of $4,575 and claiming one-half thereof as a loss against income. ↩
3. The petitioners are not claiming that they suffered a loss as a result of Northwestern Mutual's foreclosure on their mortgage, and the record does not disclose the essential details surrounding the foreclosure.↩
4. All references are to the Internal Revenue Code of 1954, unless otherwise indicated. ↩
5. Allowable losses for an individual are those "incurred in a trade or business," and "incurred in any transaction entered into for profit," as well as casualty losses.↩
6. The judge who decided the case doubted that Hillary had a cause of action. He observed in his decree that Hillary had "raised no issue which may be presented to the court * * *."↩
7. It does not appear that the petitioners are suggesting that they are entitled to deduct the amounts in question as a loss occasioned by the abandonment of the project. If such a deduction is available on the facts of this case, it can be taken only in the year of the abandonment See Lou Levy, 30 T.C. 1315, 1329-1330 (1958), and Morton Frank, 20 T.C. 511, 514-515↩ (1953). In view of the fact that the petitioners are seeking to extend the deductions over several taxable years and have not attempted to provide the Court with adequate evidence relating to the time when Hillary terminated his promotional efforts, we have concluded that they are not relying on an abandonment theory to support their claim.
8. The petitioners deducted $986 in each of the years 1961 and 1962 and allege that they deducted a similar amount in 1960. We observe that when the $986 figure is multiplied by 3, the total produced ($2,958) is $1.40 less than the expenditures which Hillary claims to have made in 1960 ($2,959.40).
9. Note that section 152(e)↩ (Support Test in Case of Child of Divorced Parents, Et Cetera"), which was added to the Code in 1967 by P.L. 90-78, is applicable only with respect to taxable years beginning after December 31, 1966.
10. In the absence of contrary evidence, we regard these amounts as being expended equally for each of the two children. Ollie J. Kotlowski, 10 T.C. 533, 536↩ (1948).
11. At trial, the petitioners attempted to prove that all amounts expended by Hillary's parents were in fact loans by them to Hillary. We found this testimony to be wholly unconvincing, especially in view of the parents' testimony that they kept records in order to assure that they would pay equal amounts to their other grandchildren. We do not believe that the parents regarded their payments as loans or had any expectation of repayment.
12. On Schedule C attached to their 1962 income tax return, the petitioners report $1,022 as the gross receipts of the Murray Hill Group. Apparently, Hillary's receipts from McCormick & Co. are included in the $1,022 figure, but it is not clear from the face of the return the extent to which that figure reflects such receipts. Hillary's testimony indicates that $1,020.18 of the $1,022 is income from McCormick & Co. However, in the absence of any evidence to substantiate this claim, we accept the respondent's figure of $900. ↩
13. The statutory notice allows $126.50 of the $365 discrepancy to be deducted as an employment agency fee.↩